Erik Estavillo
3284 Cortese Circle
San Jose, CA. 95127
(408) 593-1226
uy1uy1uy27@gmail.com



FILED

SEP 11 2019

CLERK SUSAN Y SOONG
NORTHERN U.S. DISTRICT COURT
DISTRICT OF CALIFORNIA
SAN JOSE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

Erik Estavillo,

Plaintiff,

v.

Activision Blizzard, Inc.

Defendant,

CASE NO. 5:19-cv-05540-NC

Assigned To: Hon. Nathanael Cousins
Courtroom: 5

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## 1. Introduction:

Only the Rich can afford Justice. And only a multi-billion dollar conglomerate like Activision Blizzard and its subsidiary Blizzard Entertainment, along with a gluttonous law firm such as the Schilling Law Group PC, would ask for attorney fees from a mentally-disabled, poverty-stricken, pro-per litigant deep in debt; whom has already been granted a fee waiver. I'm not a lawyer, but I'm trying my best to seek Justice where it rarely can be found via the court system. And given the history of the Federal court system taking from the poor and giving back to the rich, I wouldn't be surprised if an excessive law clerk reading this, grants that, "the plaintiff pay for the opposing sides' attorney fees". But since all my lawsuits do have merit and

1   are filed in good faith they often gain global recognition for case law studies in other countries

2   such as Australia as a simple google search of my name 'Erik Estavillo' would show, and which

3   an example can be found at this website link, for this particular case study, "INTERNET LAW:

4   SPRING 2010 PROFESSOR GRIMMELMANN NEW YORK LAW SCHOOL INTERNET LAW" and it can be

5   read here, *https://james.grimmelmann.net/courses/internet2010S/Internet2010SReader1.pdf*. I'd

6   also hate to have to report to news agencies of just how corrupt and greedy the Federal court

7   system can be should they make someone as poverty-stricken as myself pay opposing side's

8   legal fees/costs. I would have to contact NBC Bay Area and other news outlets that have already

9   covered my justice-seeking lawsuits before, as can be read here,

10

11

12  *https://www.nbcbayarea.com/news/local/SJ-Gamer-Sues-Sony-over-First-Amendment.html*. But

13  nonetheless, as I said before only a law clerk who cares more about property than people would

14  ask for such a judgment against the plaintiff and only a more corrupt Judge would grant such a

15  judgment against a mentally-disabled plaintiff who can't even afford his OWN legal fees; but

16  would let alone be expected to pay for the billion dollar company's legal costs? This wouldn't be

17

18  surprising from this court, despite plaintiff being mentally-disabled and having already been

19  granted 'in forma pauperis' due to proven financial hardships and deep debt. Nonetheless, should

20  this occur, plaintiff would then just end up having to file for bankruptcy a second time. But

21  nothing surprises me anymore as sometimes it seems that the court's inevitable goal is to get rid

22  of every pro-se, pro-per litigant from the justice system as fast as they can and keep them out of

23

24  the court system since they don't know the law. Despite nearly 70% of state court claims are

25  ALL pro-se litigants who can't afford a lawyer or the justice that accompanies the Rich who

26  have one. However, despite me not being a lawyer, for your sake, I will try to speak like one – so

27  here you go. Plaintiff, Mr. Estavillo, hereby submits its opposition to Defendant's Motion to

28

Dismiss the Complaint. The Plaintiff's Complaint not only meets but exceeds the standards governing the form of a complaint as required by Federal Rule of Civil Procedure 8(a). Specifically, this Court has personal jurisdiction over the Defendant, and the complaint sufficiently alleges causation and harm.

## 2. Overview of Causation and Harm

There has been significant causation of harm to plaintiff because of Defendant's actions which has prevented the mentally-disabled gamer from participating in his PAID DIGITAL PROPERTY that the defendant's have taken away. He now suffers panic attacks at night and has increased his medication to counter these night terrors. His heart beats faster due to these panic attacks and now can't be easily consoled and when this would usually occur, the patient would heavily rely on playing Overwatch to distract himself and talk with other gamers' about said problems to help calm and relieve these panic symptoms, but no longer could after being silenced, suspended and 'essentially' banned from said video game. He also has a worsening condition of his Crohn's disease due to him being banned from using his own personal digital property. He often has excruciating stomach pains and cannot eat like he used to. He has lost substantial weight due to stomach pains which all can be proven through his Kaiser Permanente records in which you can see him losing over 50lbs since Blizzard began systematically silencing and suspending his digitally-owned gaming account, and by the plaintiff being silenced on-end for weeks at a time, and eventually suspended for a total of 3 weeks, which is tantamount to taking away his digitally owned property that he has the right to participate in, not only for medical reasons but mainly because the plaintiff has spent more than $500 for the game and its loot boxes.

1   Furthermore, the Defendant's Motion to Dismiss has many false and/or misleading

2   statements in which I will address each. First and foremost, that I can play the game now if I

3   wanted to. This is misleading. I have already been silenced for weeks on-end, thrice. This

4   means I cannot communicate to ANYONE AT ALL via the video game's communication

5   systems, essentially eliminating my right to associate and socialize through the game by

6   purchasing it, which is a basic need of every human being, especially the mentally-disabled

7   whom need to talk to other people to feel better. The suspensions are definitely harming due

8   to the fact that they are constant and longer than a week, essentially equating to a banned

9   account. The plaintiff could no longer play his digital property for weeks on-end and when he

10  does try to play on his suspended account after the suspension is lifted "ever so slightly", he

11  will be immediately suspended again within 2 days as previous patterns prove. This results in

12  further emotional and physical distress and pain as his medical records can prove. Therefore,

13  the Defendant's misleading claim that he can play the game right now is not true because as

14  Blizzard has shown before, they WILL AGAIN SUSPEND THE ACCOUNT as can be

15  proven given their previous behavioral pattern of silencing and suspending this one particular

16  account any time the plaintiff tries to play again – therefore, the account is essentially

17  banned. However, it seems that Female, Asian, and Caucasians gamers aren't banned from

18  the game and only Mexicans and Blacks are banned. It would take discovery to prove this,

19  but there is a history of Blizzard Entertainment catering to the more privileged, rich

20  Caucasian, Asian, and Female gamers than to Hispanics and Blacks. I'm sure discovery

21  would allude to this pattern but it would require the subpoenaing of documents pertaining to

22  their banning/moderating practices in order to give more credence to this allegation.

23  Furthermore, such bannings are very harmful for mentally-disabled gamers such as the

24

25

26

27

28

plaintiff who chooses to rarely leave the house unless it is absolutely necessary, due to his panic disorder and the agoraphobia that often accompanies it. This has created a perfect storm of panic inducing Crohn's disease related flare ups in which the plaintiff has already described in terms of huge stomach pains, affected heart rhythms, and recorded weight-loss. The plaintiff is taking the medication Inflectra for his Crohn's Disease, but now has a deep-worsening depression due to the unjust ban of his digital property, in which he can no longer communicate with any one or other supportive players he found on Overwatch who would help him through tough times via the game's communication systems.

### 3. Counter Arguments to Points of Motion to Dismiss

The defendant claims that the plaintiff's complaint is meritless and not in good faith. However, lawyers and law firms are able to file hundreds of thousands of lawsuits, frivolous or not without any punishment. But if and when it's a pro-se, pro-per litigant whom decides to file anywhere from 1 up to 8 lawsuits, it's suddenly a problem because they don't possess a law degree or haven't passed the bar. It seems the court system, law clerks, and Judges all prefer to be biased and allow anyone who has 'passed the bar' to sue as much as they please. But God forbid a US Citizen Laymen such as myself, use his right to seek justice via MY federal court system in which I have the legal right to. I am suing because I paid for something and it was taken away causing harm. That's the very definition of good faith and merit.

Furthermore, the defendant claims in their motion to dismiss, that,

> **"the intention of the underlying the statute – to give consumers notice of refund policies prior to sale – is satisfied because Plaintiff was provided notice of Blizzard's refund policy at multiple places during the checkout and account creation processes."**

This is untrue. As can bee seen in the following screenshots, there is no such mentioning of the refund policy or process.

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15

In the above screenshot the required refund policy is not shown anywhere,

and at the bottom of the page where IT SHOULD BE, it still isn't.

16
17
18
19
20
21
22
23
24



25
26
27
28

I understand it may be hard to read, but a simple downloading of Battle.net's game client or

going to their store website and trying to buy any of Blizzard's games will show these initial

pages for the purchase of that particular game. Trust me, there are no explanations of refunds,

their processes, or how to obtain a refund should you no longer have access to the game due to an erroneous, unjust and/or discriminatory ban.

Nor is it explicitly explained here in checkout as defendant's claim it is.



Even more egregious is the fact that this multi-billion dollar company is trying to get kids addicted to buying loot boxes without explaining refund policies right away as can be gleaned from the screenshots below, (all loot boxes are bought WITHIN the game AFTER PURCHASE OF GAME, and marketed as micro-transactions, with zero refund information).



1    …and after you try to purchase any of these loot boxes, the below page appears.



…and again, no refund explanations whatsoever.


     The defendant also states that:

**"Plaintiff Erik Estavillo's ("Plaintiff") Complaint is a meritless and misguided ploy**
**for attention. In his autobiography titled "The PSN Plaintiff," Plaintiff details his long-**
**running practice of suing video game companies on specious claims. Plaintiff admits that**
**his lawsuits are a means for seeking attention, writing that "[e]verybody loves attention**
**no matter what kind it is."**

     Again, my words have been awfully misconstrued. When I said "everybody loves

attention no matter what kind it is", I was only and obviously referring to any attention I received

from conversing with other gamers online (not lawsuits). The kind of received attention that can

only be attained from interacting and socializing with other players online, whether it ends up

being a good or bad, positive or negative conversation. It seems the Schilling Law Group doesn't

understand games or how people interact and gain attention from other people by talking through

the video gaming medium; they obviously haven't done their due diligence. They should have

done their due diligence and read more about me online, which a simple google search of my

name would have proved that I care only about receiving attention THROUGH MY

INTERACTIONS IN VIDEO GAMES and not from lawsuits about them. This should have been apparent, but given the fact that the lawyer Matt Ardoin asked for "2 more weeks" to prepare their answer makes it seem like they were lazy and running out of time and refused to do more research about me. Furthermore, I have no qualms about my previous lawsuits because when a video gaming company is the basis for CAUSATIONAL HARM BEING CAUSED BY THEM TAKING AWAY MY DIGITAL CURRENCIES/MONIES AND MY ONLY FORM OF ASSOCATION AND ONLY MEANS OF SOCIAL SUPPORT, I inevitably look for recourse. I then have the right to sue. If video game companies are going to ban consumers and take away what we have paid for, at least provide the refund policy somewhere I can read it right away without clicking many links to get to the pertinent information needed before making an informed decision. Moving onto inadmissible evidence.

### 4) Inadmissable/Irrelevent Evidence

The defendant states:

**"For the reasons set forth above, Blizzard respectfully requests that the Court dismiss Plaintiff's Complaint with prejudice and without leave to amend. Plaintiff's lawsuit lacks merit and was filed to re-gain attention. As Plaintiff writes, whenever he "need[s] to feel a smile on my face, I have just learned to go back and read some of the articles and what people have to say about me" in connection with his prior lawsuits.**
**RJN, Ex. 1 at p. 22. Plaintiff laments that "[t]hese days, no one ever calls me or comesknocking at my door, although I sometimes wish they would." Id. at p. 23. Plaintiff's desire for attention is a wholly inappropriate reason to file a lawsuit. This case should be dismissed before the Court or Blizzard are required to waste any further time or resources. Further, the Court should award Blizzard the attorneys' fees and costs incurred to respond to Plaintiff's baseless Complaint. The Section 1723 violation that Plaintiff alleges is subject to the Consumers Legal Remedies Act, which allows a prevailing defendant to recover attorneys' fees where plaintiff acts in bad faith"**

They keep referring to my book, The Psn Plaintiff, as valid evidence in THIS CASE, but it was written nearly 10 years ago when I was a different person with different thoughts and viewpoints on life. They're trying to equate that a person will have the same viewpoints they did

10 years ago, which should in itself cause concern and alarm. I am not the same person who wrote that book; I have evolved as a human being. Therefore, it shouldn't be admitted as evidence or used in their 'Motion to Dismiss" on the legal grounds that anything said in that book is well over the statue of limitations, makes erroneous assumptions about my current viewpoints, and is irrelevant to the current case at hand.

**5) Conclusion**

Until this year, I haven't filed a case in a court system since 2014, more than 5 years ago. I'm not seeking attention, otherwise I would have sued before this year. And even though I'm used to having my old previous video game-related cases dismissed; that doesn't mean my lawsuit claims are without merit or in bad faith. My lawsuits are often featured in law articles such as UC IRVINE LAW REVIEW and can be read here, proving their merit and good faith. *https://www.law.uci.edu/lawreview/vol2/no2/humphreys_dezwart.pdf*

To put it simply, I'm a fighter for the 'litte guy" – the consumer. I always will be and I have the legal right to be, law degree or not. And when wronged, I could either just let big companies do as freely as they wish in ripping-off the customer, or I can fight back as I'm doing now. It's always been about sending a message. Consumers don't have to sit back and take it. We can ask our court systems to care about people for once and to stop being a money making machine for big corporations. Once in a while, hopefully a judge might just start ruling with a heart instead of by "Case Law". Also of note is that I never wanted to re-file this case in Federal court which is while I filed this case in state court, The Santa Clara County Superior Court, but the attorneys had it removed back here.

By:/s/ *Erik Estavillo*       ,

Erik Estavillo
Pro-se, Pro-per



*103045107*

## Physician's Statement for Medical Excuse

Participant Number: 103045107
Patient Name: ERIK CARLON ESTAVILLO
Patient Address:_____
To Federal Court Jury Clerk:
**General Excuse from Jury Service**
Please excuse the above named patient from federal jury duty due to:
CHRONIC B SIGNIFICANT PSYCHIATRIC Symptoms
_____.
It is medically advisable that the patient refrain from this type of service.
If this patient is employed please explain why it would be more detrimental to them to serve on the jury than their normal
employment.
ON DISABILITY
_____.
**Temporary Excuse from Jury Service** _____
Due to:

Name of Physician: HARRY STON
Office Address: 611 South MILPITAS BLVD
Telephone Number: 408 - 945 - 2945
Physician's license number: 677392
Signature of Physician: _____   Date: 8.26.19
**Note: This form must be submitted by the prospective juror within five business days.**

*Exhibit A – Merit & Cred Faults*

# Internet Law: Spring 2010
## Professor Grimmelmann
## New York Law School

## Reading Packet 1

# Introduction, Theory, and Jurisdiction

# CONTENTS

CLASS 1: COMPUTERS ..............................................................................3

   Blown to Bits, ch. 1 .................................................................................3
   Little Britain, Computer Says No.............................................................3
   Kennison v. Daire....................................................................................3
   Pompeii Estates, Inc. v. Consolidated Edison Co. of N.Y., Inc.................4
   NCIC Confidential Problem ....................................................................7

CLASS 2: THE INTERNET ..........................................................................9

   Blown to Bits appendix...........................................................................9
   Internet Applications Checklist problem .................................................9
   Frank H. Easterbrook, Cyberspace and the Law of the Horse..................10
   Lawrence Lessig, The Law of the Horse: What Cyberlaw Might Teach...................11

CLASS 3: "CYBERSPACE" ........................................................................17

   John Perry Barlow, A Declaration of the Independence of Cyberspace....................17
   Orin S. Kerr, The Problem of Perspective in Internet Law .....................19
   David R. Johnson and David Post, Law and Borders ............................21
   Voyeur Dorm Problem ..........................................................................25
   Live-Shot Problem ................................................................................26

CLASS 4: LAW ........................................................................................28

   Dow Jones & Co. v. Gutnick .................................................................29
   Simson Garfinkel, Welcome to Sealand. Now Bugger Off.......................37

CLASS 5: CODE ......................................................................................51

   Jack Goldsmith and Timothy Wu, Digital Borders ...............................52
   James Fallows, The Connection Has Been Reset ....................................58
   Center for Democracy and Technology v. Pappert ..................................64
   Spam Problem ......................................................................................69

CLASS 6: INTERMEDIARIES .....................................................................72

   Marsh v. Alabama..................................................................................73
   Jeffrey Rosen, Google's Gatekeepers .....................................................75
   Search King, Inc. v. Google Technologies., Inc......................................83
   Estavillo Problem .................................................................................87
   MAPS Problem .....................................................................................88

CLASS 7: PERSONAL JURISDICTION .........................................................90

   Young v. New Haven Advocate...............................................................91
   Boschetto v. Hansing.............................................................................96
   TravelJungle Problem ...........................................................................101
   Westside Story Problem ........................................................................101
   MSN Problem ......................................................................................102

*Featured* [handwritten annotation in left margin]

*Merit & Good faith & Relevance* [handwritten annotation in right margin]

CLASS 1: COMPUTERS

The first (and perhaps most important) of the four major course themes is whether and how law changes when computers—rather than people—make and enforce decisions. Thus, we begin our study of Internet Law with three cases in which the Internet doesn't even appear. These cases all involve people who've interacted with a computer in some form; the question facing a court should how to apply traditional legal standards once a computer enters the picture. I've deliberately chosen three areas of law—banking, public utilities, and civil rights—that aren't at all part of the rest of our curriculum. Don't worry about trying to learn the specific doctrines. Instead, determine what the rule would be if there weren't a computer involved, and then ask whether that rule makes sense in an "computerized" context. As we'll see—repeatedly—even when there's no doubt that law applies "to computers," figuring out *how* law applies in a new factual context can be a tricky problem.

*Preparation Questions*:

(1) "Can I have a word with the manager?" "Computer says no." What's the joke here? Have you had experiences like this? Why are computers so often associated with bureaucracy, frustration, and terrible customer service?

(2) The *Kennison* court implies that the result would have been different if the defendant had dealt with a human, rather than with a computer. Why? Would the result in *Pompeii Estates* have been different if the defendants there had dealt with a human, rather than a computer?

(3) Who programmed the computer in *Kennison*? Who programmed the computer in *Pompeii Estates*? How about the NCIC? Did any of them make design mistakes?

(4) Why did Easybank use a computer? Why did ConEd? How about the police arresting Buttle? What advantages does a computer provide? What are the disadvantages? Would society be better off if we prohibited the use of computers for these purposes altogether? If not, what safeguards do we need on their use?

(5) If you receive some information from a computer, are you allowed to take the computer at its word? If you put information into a computer, are you now responsible for all the consequences? What about the person who provides the computer? The person who programmed it? Who, if anyone, *ought* to be held responsible?


## BLOWN TO BITS, ch. 1

Please read chapter 1 of *Blown to Bits*.


## Little Britain, *Computer Says No*

Please watch the video at http://www.youtube.com/watch?v=7TYAQ0JWBzE.


### *Kennison v. Daire*
### High Court of Australia

**[1986] HCA 4; (1986) 160 CLR 129**

GIBBS C.J., MASON, WILSON, DEANE, DAWSON JJ.:

1. The appellant was convicted of larceny . . . . He was the holder of an Easybank card which enabled him to use the automatic teller machine of the Savings Bank of South Australia to withdraw money from his account with that bank. It was a condition of the use of the card that the customer's account could be drawn against to the extent of the funds available in that account. Before the date of the alleged offence, the appellant had closed his account and withdrawn the balance, but had not returned the card. On the occasion of the alleged offence, he used his card to withdraw $200 from the machine at the Adelaide branch of the bank. He was able to do so because the machine was off-line and was programmed to allow the withdrawal of up to $200 by any person who placed the card in the machine and gave the corresponding personal identification number. When off-line the machine was incapable of determining whether the card holder had any account which remained current, and if so, whether the account was in credit.

2. It is not in doubt that the appellant acted fraudulently with intent permanently to deprive the bank of $200. The appellant's submission is that the bank consented to the taking. It is submitted that the bank intended that the machine should operate within the terms of its programme, and that when it did so it gave effect to the intention of the bank.

3. In the course of an interesting argument, Mr Tilmouth pointed out that if a teller, having the general authority of the bank, pays out money on a cheque when the drawer's account is overdrawn, or on a forged order, the correct conclusion is that the bank intends that the property in the money should pass, and that the case is not one of larceny . . . . He submitted that, in effect, the machine was invested with a similar authority and that if, within the instructions in its programme, it handed over the money, it should be held that the property in the money passed to the card holder with the consent of the bank.

4. With all respect we find it impossible to accept these arguments. The fact that the bank programmed the machine in a way that facilitated the commission of a fraud by a person holding a card did not mean that the bank consented to the withdrawal of money by a person who had no account with the bank. It is not suggested that any person, having the authority of the bank to consent to the particular transaction, did so. The machine could not give the bank's consent in fact and there is no principle of law that requires it to be treated as though it were a person with authority to decide and consent. The proper inference to be drawn from the facts is that the bank consented to the withdrawal of up to $200 by a card holder who presented his card and supplied his personal identification number, only if the card holder had an account which was current. It would be quite unreal to infer that the bank consented to the withdrawal by a card holder whose account had been closed. The conditions of use of the card supplied by the bank to its customers support the conclusion that no such inference can be drawn. It is unnecessary to consider what the position might have been if the account had remained current but had insufficient funds to its credit. . . .

5. For these reasons . . . the appeal should be dismissed.

*Pompeii Estates, Inc. v. Consolidated Edison Co. of N.Y., Inc.*

**Civil Court of the City of New York, Trial Term, Queens County**
**397 N.Y.S.2d 577 (1977)**

Posner, J.:

The "Dawn of the Age of Aquarius" has also ushered in the "Age of the Computer".

There is no question that the modern computer is as indispensable to big business as the washing machine is to the American household.  To ask the American housewife to go back to washing clothes by hand is as unthinkable as asking Consolidated Edison to send out its monthly bills by any other method than the computer.

This is an action in negligence by a builder against a public utility for damages sustained as a result of the alleged "wrongful" termination of electricity at an unoccupied one-family house (that had recently been constructed by the plaintiff) at 200-15 Pompeii Rd., Holliswood. Sometime in October, 1975, the defendant had installed electric services to the plaintiff's property. On or about January 20, 1976, the defendant terminated such service because of two unpaid bills amounting to $ 25.11. Since the premises were unoccupied, the lack of electricity caused the motor which operated the heating unit to go off, which resulted in frozen water pipes, which burst and caused $ 1,030 of proven damages to the premises. . . .

Defendant through the use of five witnesses, made out a good case proving that the notice to disconnect was probably mailed even though no witness had actual knowledge of mailing this specific notice. Obviously, it would be overly burdensome, if not impossible, to expect a utility mailing out thousands of disconnect notices a day to be able to prove that each one was individually mailed. . . .

Accordingly, this court finds that the defendant did comply with the statutory requirement of mailing even though we are also convinced that the plaintiff had never received the notice because an expert witness from the U. S. Postal Department testified that the postal service does not leave mail at an unoccupied address. Unless a statute or the contract between the parties calls for actual notice proof of mailing is sufficient to prove notice, even though the notice was never received.

While the parties, at the trial and in their memoranda of law devoted considerable time to the issue of "notice", the court finds that this is not the main issue in this case. Let us say that this was a "procedural" hurdle which Consolidated Edison cleared successfully. However, the court has serious doubts as to whether the defendant has cleared the "substantive" hurdle—did it act reasonably or negligently in discontinuing plaintiff's electric service?

. . . The defendant's witnesses stated that a customer's file is opened when a new account is established and that all correspondence and other documents involving the customer are included in this file. Defendant's attorney admitted that he had found in such file the original letter from plaintiff requesting the opening of electrical current. This letter is reproduced in its entirety because of its significance to the case:

POMPEII ESTATES INC.
34-34 Bell Blvd.
Bayside, N.Y. 11361
212-631-4466

June 12, 1975

5

Google operates an Internet search engine.[1] Every search engine is controlled by a mathematical algorithm. One component of Google's mathematical algorithm produces a "PageRank," which is a numerical representation of the relative significance of a particular web site as it corresponds to a search query. The PageRank is derived from a combination of factors that include text-matching and the number of links from other web sites that point to the PageRanked web site.[2] The higher the PageRank,[3] the more closely the web site in question ostensibly matches the search query, and vice versa. Google does not sell PageRanks, and the web sites that are ranked have no power to determine where they are ranked, or indeed whether they are included on Google's search engine at all.

1   Search engines are indexing tools used to locate web sites that correspond to a user's search query. Search queries typically consist of one or more words or phrases that identify or are related to the subject of the search.

2   Although PageRanks are not displayed on Google's web site, they can be observed via a free "toolbar" that may be downloaded from Google's web site.

3   PageRank values range between 1 and 10.

Notwithstanding the fact that PageRanks cannot be purchased, they do have value. For example, highly-ranked web sites can charge a premium for advertising space. PR Ad Network ("PRAN," and together with Search King, "Search King"), which was introduced by Search King in August of 2002, capitalizes on this benefit by acting as a middleman, charging its clients a fee for locating highly-ranked web sites receptive to the idea of advertising on their sites, and in turn compensating those highly-ranked web sites with a portion of its fee. PRAN's fee is based, in part, on the PageRank assigned to the web site on which its client's advertisement and/or link is placed.

This action is based upon a PageRank reduction. From approximately February of 2001 until July of 2002, Search King's PageRank was 7. In July of 2002, Search King's PageRank was increased to 8. Before it was decreased, PRAN's PageRank was 2. In August or September of 2002, Search King's PageRank dropped to 4; PRAN's PageRank was eliminated completely, resulting in "no rank." The devaluation is alleged to have adversely impacted the business opportunities available to Search King and PRAN to an indeterminate degree by limiting their exposure on Google's search engine.

Shortly after the PageRank decreases, Search King filed the instant action alleging tortious interference with contractual relations and seeking injunctive relief,[4] compensatory and punitive damages. Specifically, Search King alleges Google purposefully and maliciously decreased the PageRanks previously assigned to Search King, PRAN, and certain unidentified, affiliated web sites on Google's Internet search engine in August or September of 2002. Search King asserts the devaluation occurred after and because Google learned that PRAN was competing with Google and that it was profiting by selling advertising space on web sites ranked highly by Google's PageRank system. Google asserts it is immune from tort liability arising out of the devaluation because PageRanks constitute protected speech.

4   Search King's motion for a preliminary injunction was denied by previous order of this Court.

II. Discussion

Motions to dismiss a complaint for failure to state a claim should be granted only where "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)). When considering a motion filed pursuant to *Rule 12(b)(6)*, "[a]ll well-pleaded factual allegations in the complaint are accepted as true ... and viewed in the light most favorable to the nonmoving party ...." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (internal citations omitted). "The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support [its] claims." *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002).

Search King asserts a single cause of action — tortious interference with contractual relations.[5] Under Oklahoma law, such an action requires a plaintiff to demonstrate: (1) the defendant interfered with a business or contractual relationship of the plaintiff; (2) the interference was malicious and wrongful, and was not justified, privileged, or excusable; and (3) the plaintiff suffered injury as a proximate result of the interference. *See Daniels v. Union Baptist Ass'n*, 2001 OK 63, 55 P.3d 1012, 1015 (Okla. 2001). The parties concede that this case turns on the second factor.[6] The Court must, therefore, determine whether Google's manual decrease of Search King's PageRank was malicious and wrongful, and was not justified, privileged, or excusable. Google asserts that its actions cannot be considered wrongful because PageRanks constitute opinions protected by the *First Amendment*. In support of that proposition, Google relies on *Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Services, Inc.*, 175 F.3d 848 (10th Cir. 1999).

5    In its Amended Complaint, Search King identifies two "causes of action." However, the first simply consists of a request for injunctive relief and, as such, does not constitute a separate cause of action.

6    The Court will assume, *arguendo*, that one or more of Search King's contractual relationships was adversely affected by the PageRank decreases and that Search King was injured as a proximate result of those decreases.

In *Jefferson County*, the Tenth Circuit, relying on the Supreme Court's holding that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection," *Jefferson County*, 175 F.3d at 852 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)), held that *First Amendment* protection extended to a financial rating service's unfavorable review of the value of a school district's refunding bonds. *See id.* at 852-55. At the same time, the court dispensed with the school district's allegation that Moody's acted intentionally and with malice, noting that "even when a speaker or writer is motivated by hatred or illwill his expression [is] protected by the *First Amendment*." *Id.* at 857-58 (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 53, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988) (alteration in original)). Based in large part on the constitutional protection afforded the review, the Tenth Circuit affirmed the district court order granting Moody's motion to dismiss the school district's claims for intentional interference with contract, intentional interference with business relations, and publication of an injurious falsehood. *See id.* at 860.

Search King contends that PageRanks are objectively verifiable, and that *Jefferson County* is therefore distinguishable from the instant case. First, Search King notes that Lawrence Page ("Page"), the founder of Google and the inventor of the PageRank system, holds a U.S. patent on

the system. Search King argues that because ideas are not patentable, *see Gottschalk v. Benson*, 409 U.S. 63, 67, 93 S. Ct. 253, 34 L. Ed. 2d 273 (1972), and because patented products or processes must be replicable, *see* 37 C.F.R. § 1.71(a) (2003) (providing that a patent specification must "include a written description of the invention or discovery and of the manner and process of making and using the same, and is required to be in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which the invention or discovery appertains, or with which it is most nearly connected, to make and use the same"), the PageRank system must be objective in nature, and therefore capable of being proven true or false.

Next, Search King points out that in his doctoral thesis at Stanford University, Page describes the PageRank system as objective and mechanical, and also notes that Google's web site declares the PageRank system "honest and objective." Search King argues that Google cannot "have it both ways," professing the objectivity of the PageRank system on one hand, and relying on the subjective nature of the system in order to avoid tort liability on the other.

Two questions remain. First, are PageRanks constitutionally protected opinions? Second, if PageRanks fall within the scope of protection afforded by the *First Amendment*, is the publication of PageRanks *per se* lawful under Oklahoma law, thereby precluding tort liability premised on the intentional and even malicious manipulation of PageRanks by Google? The Court answers both questions in the affirmative.

"It is always a question for the court to determine as a matter of law whether a published statement is within the protected class of speech." *Gaylord Entertainment Co. v. Thompson*, 1998 OK 30, 958 P.2d 128, 142 (Okla. 1998). Google argues that PageRanks are subjective opinions, not unlike Moody's review of the school district's refunding bonds in *Jefferson County*. Search King's first argument to the contrary, with respect to the requirement that patented processes be replicable, is not wholly without merit. Because patented processes must be capable of replication, it stands to reason that the intentional deviation from such a process would result in a provably false result to the extent the result would have been different in the absence of manipulation. However, this reasoning ignores the important distinction between process and result. Here, the process, which involves the application of the PageRank algorithm, is objective in nature. In contrast, the result, which is the PageRank — or the numerical representation of relative significance of a particular web site — is fundamentally subjective in nature. This is so because every algorithm employed by every search engine is different, and will produce a different representation of the relative significance of a particular web site depending on the various factors, and the weight of the factors, used to determine whether a web site corresponds to a search query. In the case at bar, it is the subjective result, the PageRank, which was modified, and which forms the basis for Search King's tort action.

The Court finds Search King's alternative argument, with respect to certain statements regarding the purported objectivity of the PageRank system, is similarly unpersuasive. As discussed above, the objective nature of the PageRank algorithm, assuming it is adhered to by Google, is not in question. But neither is it at issue. At issue is the subjective result produced by an algorithm unique to Google. Just as the alchemist cannot transmute lead into gold, Google and Page's statements as to the purported objectivity of the PageRank system cannot transform a subjective representation into an objectively verifiable fact.

In view of the foregoing discussion, the Court concludes that *Jefferson County* is analogous to the case at bar. Like the review in *Jefferson County*, the Court finds that PageRanks relate to matters

of public concern, in this case, via the "World Wide Web." In addition, the Court finds that PageRanks do not contain provably false connotations. PageRanks are opinions — opinions of the significance of particular web sites as they correspond to a search query. Other search engines express different opinions, as each search engine's method of determining relative significance is unique. The Court simply finds there is no conceivable way to prove that the relative significance assigned to a given web site is false. Accordingly, the Court concludes that Google's PageRanks are entitled to "full constitutional protection." *Jefferson County*, 175 F.3d at 852 (quoting *Milkovich*, 497 U.S. at 20).

Having determined that PageRanks are constitutionally protected opinions, the Court must now consider whether, under Oklahoma law, Google is immune from tort liability arising out of the intentional manipulation of PageRanks. In *Jefferson County*, the Tenth Circuit concluded that under Colorado law, protected speech cannot constitute improper interference in the context of a claim for tortious interference with contractual relations. *See id.* at 858. The Court finds that Oklahoma law compels the same conclusion in this case.

In *Gaylord*, the Oklahoma Supreme Court held that constitutionally protected speech is *per se* lawful and, therefore, cannot give rise to an action for tortious interference with advantageous business relations. *See Gaylord*, 958 P.2d at 149-50. Notwithstanding that the elements of a tortious interference with advantageous business relations claim differ from the elements of a tortious interference with contractual relations claim, the Court would note that both claims require that the interference be *unlawful. See id.* & nn. 96, 97. Therefore, the Court finds that under Oklahoma law, protected speech — in this case, PageRanks — cannot give rise to a claim for tortious interference with contractual relations because it cannot be considered wrongful, even if the speech is motivated by hatred or ill will. *See Jefferson County*, 175 F.3d at 857-58. Accordingly, the Court finds that Search King has failed to state a claim upon which relief may be granted.

III. Conclusion

In view of the foregoing, the Court hereby GRANTS Google's Motion to Dismiss and DISMISSES Search King's Complaint without prejudice. The Court DENIES Search King's Motion to Alter and/or Amend Judgment as moot.

### Estavillo Problem

This problem is based on *Estavillo v. Sony Computer Entertainment America Inc.*, No. C-09-03007 RMW, 2009 U.S. Dist LEXIS 86821 (2009).

Erik Estavillo sued Sony Computer Entertainment America, which sells the PlayStation and operates the online PlayStation 3 Network. His *pro se* complaint alleged:

4. Sony Computer Entertainment America has caused pain and suffering to an already disabled plaintiff, who suffers from Obsessive-Compulsive Disorder, Panic Disoder, Major Depression, and Crohn's Disease. The pain and suffering was caused by the defendant, Sony, banning the plaintiff's account on the Playstation 3 Network, in which the plaintiff relies on to socialize with other people, since it's the only way the plaintiff can truly socialize since he also suffers from Agoraphobia. The plaintiff has convincing medical documents to prove all of his diseased conditions.

Merit
&
Good
Faith
&
Relevence

5. The ban is supposedly due to the behavior of the plaintiff when he plays the video game "Resistance: Fall of Man," which Sony owns and employs moderators for its online play. These moderators kick and ban players that they feel are deserving; though their biases to as player seems to be whatever determines the kick or ban from the Resistance game server. The need for moderators on Resistance is unnecessary since other players can both mute and/or ignore any player they wish.

6. In this first count, the plaintiff was exercising his First Amendment Right to Freedom of Speech in the game's public forum when he was banned from, not only the Resistance video game, but also banned from playing all other games online via the PlayStation Network. Sony's PlayStation 3 is the only gaming system that incorporates this type of wide-ranged ban. As where Nintendo does not ban customers at all. And Microsoft Xbox rarely bans, and only for repeated illegal offenses. ...

Sony moves to dismiss under F.R.C.P. 12(b)(6) for failure to state a claim. If Estavillo responds by relying on *Marsh v. Alabama*, how should the court rule?

## MAPS Problem

The following is taken from the statement of facts in *Media3 Technologies LLC v. Mail Abuse Prevention System*, No. 00-CV-12524-MEL, 2001 U.S. Dist. LEXIS 1310 (D. Mass. Jan. 1, 2001):

Media3 is an Internet "web-hosting" company based in Pembroke, Massachusetts, that offers services in creating and maintaining websites to those who wish to conduct electronic commerce. As a "web-hosting" company, Media3 is the owner of forty-two "Class C network address blocks." Each block is capable of holding approximately 254 "Internet protocol addresses" on which websites may be placed. Media3 rents Internet protocol addresses on these Class C networks to individuals and organizations who wish to create websites. Often with Media3's help, these customers then build websites which Media3 also assists in maintaining.

Before agreeing to host a website, Media3 follows the standard industry practice of requiring its customers to sign an Acceptable Use Policy for conducting business on the Internet. This policy contains provisions which are standard in the industry, including an "anti-spam" provision.

Spam is the industry term used to describe unwanted e-mail that is often sent en masse to e-mail addresses for commercial purposes. For obvious reasons, spam is unpopular with many in the Internet community. One not so obvious, but critically important, reason why spam is unpopular is that while it is free to send it costs money to receive Media3's Acceptable Use Policy prohibits not only the transmission of spam, but also the support of spam through the development of software which could be used to hide the origin of a person sending spam.

Although Media3's Acceptable Use Policy bars websites it hosts from supporting spam in some ways, it does not prohibit its hosted websites from providing other services which appear to be used primarily by spammers. These services include the sale of lists of hundreds of thousands and even millions of e-mail addresses and computer software

*[handwritten: Exhibit B - Relevence & Merit of Cases & Good Faith]*

# Griefing, Massacres, Discrimination, and Art: The Limits of Overlapping Rule Sets in Online Games

### Sal Humphreys* and Melissa de Zwart**

Introduction ........................................................................................... 507
I. Game Rules, the Magic Circle, and Heterotopias .................................. 510
II. End User License Agreements ............................................................. 515
III. Breaking the Rules ............................................................................ 516
IV. Griefing ............................................................................................ 517
V. User-Generated Content, Creativity, and Pushing the Boundaries ........ 519
VI. Policing and Sanctions—Whose Job Is It to Enforce Rules? ............... 521
VII. Case Studies .................................................................................... 522
    A. Case Study One: Twixt ................................................................. 523
    B. Case Study Two: The World of Warcraft (WoW) Funeral Massacre .. 525
    C. Case Study Three: The GLBT Guild Recruitment Ad in WoW .......... 527
    D. Case Study Four: dead-in-iraq ...................................................... 530
Conclusions ........................................................................................... 535

*[handwritten: Featured]*

*As long as there have been games there have been rules. And as long as there have been rules there has been the possibility of breaking them.[1]*

### INTRODUCTION

    This Paper examines some of the issues that arise from massively multiplayer online games (MMOGs), not only from the existence of game platforms across global jurisdictions, but also from the ways in which a number of different rule

---

\* Dr. Sal Humphreys is a lecturer in Media at the University of Adelaide, Australia. She researches digital games and social networking sites and has published on issues relating to governance, labor, intellectual property, and new media.

\*\* Dr. Melissa de Zwart is an Associate Professor at the Adelaide Law School, University of Adelaide, Australia, researching in the area of copyright, contract, and the digital environment. She has published widely on issues related to social networking, virtual worlds, and online communities.

    1.  Julian Kücklich, *Homo Deludens: Cheating as a Methodological Tool in Digital Games Research*, 13 CONVERGENCE 355, 362 (2007).

sets apply to games. Much as citizens find themselves subject to the rules of particular local authorities, state governments, and federal governments—and sometimes there are tensions between the different sets of rules these bodies seek to implement—the intersection of game rules, legal rules, and social norms or community rules also creates a number of tensions worth exploring.

We are interested in the question of whether there are any legal rights or norms that should override game rules, and also in the issue of enforcement of rules and accountability. In considering people's consciousness and deployment of various rule sets, we are engaged in a study that employs frameworks from critical legal pluralism and legal consciousness studies.[2] Online digital games provide an interesting case study for the negotiation of intersecting rule sets or "laws" (in a very expansive definition of law that includes socially constructed normative orders). Our reason for doing so is, in part, to address the phenomenon we have observed of state-based law competing with other rule sets and not always succeeding in being the central and dominant force in regulation of online environments.

To tease out the issues we will first consider the function of rules in games and the ways in which they deliberately alter the rules of "everyday life." Understanding games as necessarily deploying alternate sets of rules then raises the question of whether there are any rules that should be quarantined from such changes. Should game companies be constrained in the contractual agreements they enter into with players about the way affairs proceed inside a gamespace? At what point and for what reasons might a participant reasonably turn to the external legal system for redress for an in-game injustice? And at what point should governments intervene in the conduct of the game? Should there be limits placed on the rights a contract can ask a participant to forgo, and in what circumstances? In what ways should governments consider intervening in matters such as content regulation, discrimination, hate speech, freedom of speech, privacy, and other causes of action? These are all questions complicated by the existence of game platforms that cross national boundaries and legal rule sets, as well as the issues that may subsequently arise from the cross-cultural diversity of standards and norms. Thus, this Paper works in the territory of critical legal theory and its intersection with some forms of legal pluralism. It investigates "the dynamic interconnections between normative orders,"[3] positioning the law among

---

2.  For discussion of the tenets and arguments for and against these frameworks see ROSIE HARDING, REGULATING SEXUALITY: LEGAL CONSCIOUSNESS IN LESBIAN AND GAY LIVES 8–34 (2010). She argues that a combination of studies in legal consciousness and legal pluralism offers not only an empirical description of actual deployments and understandings of law and legality in everyday life, but a means of theoretical critique of legal centrism and legal monism that is pervasive in legal studies.

3.  Margaret Davies, *Legal Pluralism*, *in* THE OXFORD HANDBOOK OF EMPIRICAL LEGAL RESEARCH, 806 (Peter Cane & Herbert Kritzer eds., 2010); *see also* John Griffiths, *What Is Legal Pluralism?*, 24 J. LEGAL PLURALISM & UNOFFICIAL L. 1 (1986).

a set of competing orders that span social, community, commercial, and global contexts. The Paper suggests that explicit rule sets, found in orders such as the law and game codes, compete with tacit and social rules that introject such systems. The multilayering of the various competing orders makes for a dynamic and constantly changing process of negotiation of the limits of different rules (encompassing legal, illegal, and nonlegal rules) by players and by game owners, designers, and regulators. It is a process-oriented approach that attempts to understand the different discursive constructions present within MMOG spaces.

MMOGs can have player populations the size of small nations (World of Warcraft had 11.1 million registered and active accounts in 2011).[4] They are usually proprietary spaces, despite their often quasi-public feel. Given the relatively large numbers of people subjected to the governance of private corporations within these spaces, and given that many of these players spend significant amounts of time and frequently money on the game world, the issue of how rules are both established and enforced within game worlds is important.

We begin this Paper by exploring the nature of gamespace. Rather than characterizing gamespace as separate from "the real world" and quarantined by the magic circle, we use the concept of heterotopias, as outlined by Foucault, as a more useful prism for understanding the altered articulation of rule sets found in gamespaces. This Paper will then consider a range of in-game activities by players and question whether such activities, including modding, griefing, and cheating,[5] should be characterized as legitimate forms of behavior, social activism, and/or protest, and therefore be protected by the application of external laws. We will analyze a spectrum of disruptive practices and assess the legitimacy of antisocial activity in MMOGs according to various community norms and ethical and legal criteria, including the legality of such behavior under the terms of the relevant End User License Agreements (EULAs) and applicable external laws. Our argument suggests that the emergent gameplay in online games, and the tacit community norms that result from unpredictable and somewhat unregulated play, create a level of uncertainty and tension about which regulatory body should arbitrate and resolve conflict. In examining four cases where conflict has arisen, and considering the characterization of the conflict by the participants and the strategies they employed to resolve the conflicts, we can observe the various constructions of legality that emerge.

---

4. Frank Cifaldi, *World of Warcraft Subscriptions Continue to Decline, Though More Slowly*, GAMASUTRA (Aug. 3, 2011), http://www.gamasutra.com/view/news/36351/World_of_Warcraft _Subscriptions_Continue_To_Decline_Though_More_Slowly.php.

5. The term "modding" refers to modification to the game and its assets made by players and can encompass changes to artwork, coding and artificial intelligence algorithms. "Cheating" refers to breaking rules, and "griefing" refers to deliberately spoiling play for other players. These terms are discussed more thoroughly below.

I. GAME RULES, THE MAGIC CIRCLE, AND HETEROTOPIAS

Games achieve their status as games through devising sets of rules that vary from the "rules" of everyday life. Players then consent to these rules in order to enter the game and play. Huizinga first defined a game through its establishment of this magic circle in 1938 in his seminal work *Homo Ludens*.[6] Huizinga examined the way in which a separate order is created by the game rule set. He suggested that the game world was completely separate from the ordinary world. While some games theorists argue for this separation,[7] other theorists have since argued that this complete separation is a myth.[8] There are many ways in which the ordinary world intrudes, and the boundary between game world and ordinary world is permeable.[9] As Consalvo suggests, "the concept of the magic circle seems static and overly formalist. Structures may be necessary to begin gameplay, but we cannot stop at structures as a way of understanding the gameplay experience."[10] Those who argue for the magic circle are, in some ways, arguing for a separate jurisdiction in which the state should have no role, and in which game owners and providers should hold the power to determine the conduct of the game.[11] While such schemas seem neat in their delineation of powers, they tend to ignore the agency and power of the communities and players as well as the introjections of the nongame world into the game world, despite the cries for adherence to the

---

6.  JOHAN HUIZINGA, HOMO LUDENS: A STUDY OF THE PLAY ELEMENT IN CULTURE (Beacon Press 1971) (1938); *see also* KATIE SALEN & ERIC ZIMMERMAN, RULES OF PLAY: GAME DESIGN FUNDAMENTALS (2004).

7.  *E.g.*, RICHARD BARTLE, DESIGNING VIRTUAL WORLDS (2004); EDWARD CASTRONOVA, SYNTHETIC WORLDS: THE BUSINESS AND CULTURE OF ONLINE GAMES (2005); F. Greg Lastowka & Dan Hunter, *The Laws of the Virtual Worlds*, 92 CALIF. L. REV. 1, 3 (2004); Richard Bartle, *Pitfalls of Virtual Property*, THEMIS GROUP (April 2004), http://www.themis-group.com/uploads/Pitfalls%20of%20Virtual%20Property.pdf.

8.  Joshua A.T. Fairfield, *Anti-Social Contracts: The Contractual Governance of Virtual Worlds*, 53 McGill Law Journal 427 (2008) [hereinafter Fairfield, *Anti-Social Contract*]; Joshua A.T. Fairfield, *The God Paradox*, 89 B.U. L. Rev. 1017 (2009) [hereinafter Fairfield, *The God Paradox*]; Joshua A.T. Fairfield, *The Magic Circle*, 92 Vand. L. Rev. 823 (2009); Joshua A.T. Fairfield, *Virtual Property*, 85 B.U. L. REV. 1047 (2005).

9.  *See* Rebecca Farley, *Game*, 3 M/C: J. MEDIA & CULTURE 5 (2000), *available at* http://journal.media-culture.org.au/0010/game.php, for a discussion on the persistence of physical injury incurred in sport beyond the duration of the game; *see also* MIA CONSALVO, CHEATING: GAINING ADVANTAGE IN VIDEOGAMES (2007) (considering the area of walk-throughs, game guides, cheats and alternate reality games that all breach the boundary); Edward Castronova, *The Price of Bodies: A Hedonic Pricing Model of Avatar Attributes in a Synthetic World*, 57 KYKLOS 173 (2004); Richard Heeks, *Current Analysis and Future Research Agenda on "Gold Farming"* (Development Informatics: Working Papers Inst. for Dev. Pol'y and Mgmt., Manchester U. 2008), *available at* http://www.sed.manchester.ac.uk/idpm/research/publications/wp/di/di_wp32.htm (on secondary economies that move the game economy into the sphere of real economic activity).

10.  Mia Consalvo, *There is No Magic Circle*, 4 GAMES AND CULTURE 408, 415 (2009).

11.  *E.g.*, Richard Bartle, *Virtual Worldliness: What the Imaginary Asks of the Real*, 49 N.Y.L. SCH. L. REV. 19 (2004); Edward Castronova, *The Right to Play*, *in* STATE OF PLAY: LAW AND VIRTUAL WORLDS 68, 68 (Jack M. Balkin & Beth S. Noveck eds., 2006).

separation.[12] The conception of power inherent in the magic circle is very much a top-down understanding.[13] The simplification of space into a coherent and self-contained bubble of social activity ruled by the game owners or providers ignores the reality of the many bottom-up resistances, strategies, and negotiations that take place, without necessarily referencing state-based law or owner-based rules and their mechanisms of governance. It also ignores the cultural baggage that all players and regulators bring with them into the space from outside. All space is socially constructed,[14] and all games will operate on the basis of socially constructed understandings of the players, the game designers, and the providers. To dream of a separation of the gamespace from other social spaces is to wish for a utopian simplicity that will never be available.

It may be more useful to use Foucault's notion of heterotopias to characterize gamespaces, not as separate, but as cultural spaces reordered in a way that is still working in relation to everyday spaces.[15] In recognizing that every society still has a notion of the sacred and profane—that there still remain some spaces that are "sacred"[16]—Foucault suggests that some of these spaces are not utopian (which he characterizes as placeless places—because they are aspirational, never real) but heterotopian—connected to all other spaces at the same time as they invert them. The heterotopic space contains orders that operate on an oppositional logic to ordinary everyday spaces without insisting on a complete separation.[17] Foucault suggests we have entered an era where space is conceptualized according to the relationships among sites.[18] Heterotopias are particular kinds of sites that we can read through the following six characteristics.

First, every culture has these spaces. "They are sites that have a general relation of direct or inverted analogy with the real space of society."[19] They take varied forms, but often involve the corralling of deviant behaviors.[20] In relation to games, it is often suggested that games are places to experiment with taboo behaviors; for instance, to be terribly violent or behave "badly" or perhaps deviate from gender norms by playing as a character of another gender. Some consider a game as an opportunity to discharge aggressive feelings in a safe way which has no

---

12.  Joshua A.T. Fairfield, *The Magic Circle*, 11 VAND. J. ENT. & TECH. L. 823, 824 (2009).

13.  Lastowka & Hunter, *supra* note 7, at 10.

14.  BENEDICT ANDERSON, IMAGINED COMMUNITIES: REFLECTIONS ON THE ORIGIN AND SPREAD OF NATIONALISM (1991); DOREEN B. MASSEY, SPACE, PLACE AND GENDER (1994).

15.  Michel Foucault, *Of Other Spaces*, DIACRITICS, Spring 1986, at 22, *available at* http://foucault.info/documents/heteroTopia/foucault.heteroTopia.en.html.

16.  *Id.*

17.  *See* GREG LASTOWKA, VIRTUAL JUSTICE: THE NEW LAWS OF ONLINE WORLDS 117–118 (2010).

18.  Foucault, *supra* note 15, at 23.

19.  *Id.* at 24.

20.  *Id.* at 25.

"real" effect on other people.[21] We can thus identify a particular discourse about games that positions them as deliberately available for deviant behavior. However, this becomes problematic in working out how to regulate gamespace. How do the "referees" in a game ensure that the tacit rules about deviant behavior are both agreed upon and understood? How far can the boundaries be pushed before the deviant behavior is considered too poor even for the game? These are highly contingent matters.[22]

Second, the function of the heterotopic space can change over time. In arguing for historical and cultural specificity, Foucault uses the cemetery in western cultures as an example of a heterotopic space that shifts from its place in the center of town, next to the church, before it eventually occupies a space on the edge of town. In this process, death has been transformed within these cultures from being understood as a transition to heavenly space to being an "illness" associated with contagion. Thus the cemetery still exists as a space, but it transforms with the evolving culture.[23] Thinking about this in relation to online games allows for an understanding of the role of games to change and evolve, and the emergent nature of gamespace to be understood. Online digital games and their functions will always be historically and culturally specific in their significance and in the ways they change over time. Flexibility rather than rigidity is a useful aspect of the model when thinking about the tacit rules of gamespaces. Humphreys and others[24] have argued elsewhere that MMOGs in particular are in constant production—never a finished text in the way of some other media products—and that players contribute in significant ways to the evolution of games through their playing and their productive activities such as modding.[25] In part it is their social interactions that drive this emergent and evolving characteristic. Thus, in understanding and developing policies and attitudes toward the conduct of games, we need to remain flexible and open to the contingencies and specificities of games.

Third, a "heterotopia is capable of juxtaposing in a single real place several

---

21. *See* Brad J. Bushman & Jodi L. Whitaker, *Like a Magnet: Catharsis Beliefs Attract Angry People to Violent Video Games*, 21 PSYCHOL. SCI. 790 (2010); Thomas Nys, *Virtual Ethics*, 17 ETHICAL PERSP. 79 (2010).

22. *E.g.*, Melissa de Zwart, *Piracy vs. Control: Models of Virtual World Governance and Their Impact on Player and User Experience*, 2 J. VIRTUAL WORLDS RES. 3 (2009) (discussing the world of EVE Online, where players are encouraged to engage in piracy, murder, and looting).

23. Foucault, *supra* note 15, at 25.

24. John A. Banks, *Opening the Production Pipeline: Unruly Creators*, *in* WORLDS IN PLAY: INT'L PERSP ON DIGITAL GAMES RESEARCH 143 (Suzanne De Castell & Jennifer Jenson eds., 2007); Sal Humphreys et al., *Fan Based Production for Computer Games: User Led Innovation, the 'Drift of Value' and the Negotiation of Intellectual Property Rights*, 114 MEDIA INT'L AUSTL. 16 (2005); Hector Postigo, *Video Game Appropriation Through Modifications*, 14 CONVERGENCE 59 (2008).

25. Sal Humphreys, *Productive Players: Online Computer Games' Challenge to Conventional Media Forms*, 2 J. COMM. & CRITICAL/CULTURAL STUD. 36 (2005).

spaces, several sites that are themselves incompatible."[26] The aptness of this description for online games—where players sit in a room (maybe a bedroom, a lounge room, or an Internet cafe in a specific country) and play in a gamespace inside the global network and through screens representing three-dimensional scenarios quite different from the room—is clear. The multiplicity of spaces that pertains to the single experience is one of the things that complicates regulation. Foucault talks of the development of oriental gardens over thousands of years as spaces where a larger universe is represented within the smaller space of the garden so that the walker experiences something quite other than the surrounding location would afford.[27] This description fits rather well with the space of online games, where fictional worlds are created and experienced contiguously with offline spaces.

Fourth, heterotopias are linked to slices of time.[28] One example of this that Foucault gives is that of the festival or fairgrounds. A person enters the space for a delineated period of time and experiences something different. Games are very much linked to slices of time. A person plays for a length of time, and then stops playing. The game is marked off temporally as well as spatially.

Fifth, heterotopias are not public spaces—entry requires permission, and exclusions are made. There is a "system of opening and closing that both isolates them and makes them penetrable."[29] Sometimes entry requires rituals, sometimes entry is compulsory, sometimes it is very open—but the space is defined by exclusions rather than fulfilling requirements to enter. MMOGs have a number of rituals (logging on, for instance) and requirements (payment of fees, etc.) that mark the start of playing, and a number of means of exclusion (from community exclusions using social mechanisms to computer-coded denials of access to commercial mechanisms that require payment for access). As mentioned earlier, the gamespaces available online are for the most part proprietary rather than public.

Finally, heterotopias function *in relation to* all other space that remains. Foucault suggests they can either work as a space of illusion that exposes the illusion of real spaces, or as a space of order in the face of the chaos of real space.[30] We can see how digital games can fit either of these ways of characterizing space—reflecting back the real world we live in, in ways that expose it to scrutiny and reflection, or making possible a sense of order and control to prevail when no such thing is available to us in our real lives.

Understanding online gamespaces through the model of heterotopias gives us the ability to characterize games not as completely separate, and hence subject

---

26. Foucault, *supra* note 15, at 25.
27. *Id.*
28. *Id.* at 26.
29. *Id.*
30. *Id.* at 27.

*UC IRVINE LAW REVIEW*                    [Vol. 2:507

only to the rules of the game, but as spaces interrelated with other "real" spaces and subject to a variety of cultural and legal rules. The articulation of that complexity is something that publishers, legal practitioners, governments, and players are still exploring and negotiating.[31]

Online game worlds as heterotopias continue the tradition of all games' dependency on rule sets as a mechanism of differentiation from real-world spaces, and on player consent to such rule sets. In this way, game worlds can be quite different from other online spaces (such as social networking sites or virtual worlds). It is important to make this distinction and to understand that discussions about the intersection of legal rules and online game rules do not necessarily pertain to other online virtual worlds that do not characterize themselves as games. However, the permeability of the game-world boundary does create interesting grey areas that excite much debate about "jurisdiction." Who should be responsible for enforcement, and of which rule set, is not always clear. It is not clear, for example, in games such as World of Warcraft, where players may spend upwards of twenty hours a week inside the gamespace, that all activity constitutes gameplay.[32] (For example, players may spend time socially within a game, as opposed to actually playing the game.) This is an example of the permeability of the space and its embeddedness in other places and cultural or social regimes.

Because interactivity allows for the agency of players to varying degrees, much of what occurs in game worlds is derived from player action, creativity, and imagination. The consequent emergent behaviors, tacit rules and norms, and user-generated content present a reality of bottom-up construction of "legality." How are we to understand the role of state-based law and its articulation with this emergent and socially constructed set of negotiations, as well as with the game-based rules? And given the various cultural tolerances across the globe for different kinds of behavior, which legal rule sets should be brought to bear in a cross-jurisdictional setting? Understanding how the players themselves construct a sense of legality and negotiate conflict (which is, at another level, often the heart of gameplay itself) gives us insights into the flows of power and resistance that exist within the gamespace, and a clear example of the decentering of state-based law as the determining set of rules through which people operate.[33] Thus, we argue not only for the social construction of space, but also for the social construction of legality pertaining to that space.

---

31. *E.g.*, EUROPEAN NETWORK & INFO. SECURITY AGENCY, VIRTUAL WORLDS, REAL MONEY (2008), *available at* http://www.enisa.europa.eu/activities/identity-and-trust/past-work-areas/massively-multiplayer-online-games-and-social-and-corporate-virtual-worlds/security-and-privacy-in-virtual-worlds-and-gaming.

32. For an extended ethnographic study of the range of player experiences in World of Warcraft, see WILLIAM SIMS BAINBRIDGE, THE WARCRAFT CIVILIZATION (2010).

33. See PATRICIA EWICK & SUSAN S. SILBEY, THE COMMON PLACE OF LAW (1998), for a discussion of how peoples' understandings and construction of the law and legality create or constitute legality.

## II. END USER LICENSE AGREEMENTS

The end user license agreement (EULA) is the mechanism that attempts to articulate the terms of interface between rule sets of the game and real-world law, and between the publishers and the players. Often these lengthy contracts are used in conjunction with a terms of service agreement and a rules of conduct document. There are a number of difficulties with the EULA as an instrument of governance in these contexts.

First, the fact that lawyers draft the terms of the EULAs of many games for the purpose of avoiding liability and risk, and not for the purpose of governance, creates a fundamental flaw in the EULA as a governance document.[34] Thus, while there may be supplementary rules such as the rules of conduct, the rules as laid out in a EULA may never actually align with the practices of the publisher in its governance of the online game. Players often see the EULA terms as unenforced, so many players do not see them as meaningful documents.[35] This is not helped by the language that most EULAs are written in—high legalese—and the inability of most users to understand them. They are standard-form clickthrough contracts that are rarely read. They do not represent meaningful informed consent on the part of the player, and as such they stand apart from the user's understanding of game rules and from the user's consent to participate in the game.[36] The first set of game rules that is meaningful to the player is likely to be the rules that are hard coded (rules which can be changed only if the user changes the game's source code) into the environment and that are difficult to break without cheating. The second set is likely to be the community rules and norms that are tacit within the environment and that may vary—from community to community and server to server.[37] As the EULAs tend to cater to worst-case scenarios and try to manage risk for the company when things go terribly wrong, they are not uniformly enforced by the game managers or customer service team that works inside the game, and therefore many players do not see the EULAs as relevant.

The EULA is the contractual document between the private parties of the player and the game provider, but it is also the interface between private law and public law. It is the document that courts consider when either private party seeks

---

34.   LASTOWKA, VIRTUAL JUSTICE, *supra* note 17, at 94 ("In essence, the contractual rules of the average world are not designed as mechanisms of governance but as defensive measures to protect virtual world owners.").

35.   Melissa de Zwart & David Lindsay, *Governance and the Global Metaverse*, *in* EMERGING PRACTICES IN CYBERCULTURE AND SOCIAL NETWORKING 65, 77–78 (Daniel Riha & Anna Maj eds., 2010).

36.   Fairfield, *Anti-Social Contracts*, *supra* note 8, at 447–59.

37.   *See* T.L. Taylor, *Does WoW Change Everything? How a PvP Server, Multinational Player Base, and Surveillance Mod Scene Caused Me Pause*, 1 GAMES AND CULTURE 318 (2006) (discussing European servers and their difference from U.S. servers, as well as community policing and lateral surveillance within games).

redress for a variety of injustices.[38] As such, it can be seen to articulate the relationship between government, real-world law, players, game publishers, and game rules. Sadly, it generally fails as a meaningful articulation of this relationship, being a one-sided document that attempts to secure the position of the publisher rather than to establish governance protocols.[39] Further undermining the effectiveness of the EULA as a governance and/or problem solving mechanism is the fact that players have no input into its drafting or negotiation. Although a contract is often lauded as enabling a context-specific bargain for the benefit of both parties, a EULA is drafted on behalf of the provider and imposed upon the user. As the player has no opportunity to negotiate its terms, the EULA cannot be seen as having been endorsed or adopted by the players, who have no choice regarding their participation in the game other than exit. Further, as the contract is between the provider and the player, it does not provide an effective mechanism for regulation of conduct between players. It is purely a regulatory mechanism imposed from above.[40]

We need to consider the EULA as just part of a complex raft of regulatory regimes in operation—from the computer code to the community norms, from the government content regulation schemes to the publishers' in-game community management.

### III. Breaking the Rules

One way to examine the issues at stake here is to look at various rule-breaking scenarios to see what the recent responses have been, and to explore the discussions and controversies that have been generated around such incidents. Cheating in games comes in many forms.[41] Some forms of cheating are reasonably straightforward cases of breaking the explicit rules of the game. However, there are some forms of cheating where things are not so clear: where the behavior of the player or players may be breaking either the internal, implicit, social, and

38.   See, for example, the litigation relating to Second Life (which is not an MMOG, but shares many relevant characteristics, including a one-sided EULA), *Bragg v. Linden Research, Inc.*, 487 F. Supp. 2d 593 (E.D. Pa. 2007), and *Evans v. Linden Research, Inc.*, 763 F. Supp. 2d 735 (E.D. Pa. 2011).

39.   Dan L. Burk, *Authorization and Governance in Virtual Worlds*, 15 FIRST MONDAY 1 (May 3, 2010), *available at* http://firstmonday.org/htbin/cgiwrap/bin/ojs/index.php/fm/article/view/2967/2527; Dale Clapperton & Stephen Corones, *Unfair Terms in "Clickwrap" and Other Electronic Contracts*, 35 AUSTL. BUS. L. REV. 152 (2007); Andrew Jankowich, *EULAw: The Complex Web of Corporate Rule-Making in Virtual Worlds*, 8 TUL. J. TECH. & INTELL. PROP. 1, 1–5 (2006).

40.   Melissa de Zwart, *Contractual Communities: Effective Governance of Virtual Worlds*, 33 U.N.S. WALES L.J. 605 (2010); Fairfield, *Anti-Social Contracts*, *supra* note 8; Fairfield, *The God Paradox*, *supra* note 8; Jankowich, *supra* note 39.

41.   Definitions of cheating can be found in CONSALVO, *supra* note 9; Stefano de Paoli & Aphra Kerr, *The Assemblage of Cheating: How to Study Cheating as Imbroglio in MMORPGs*, FIBRECULTURE J. (July 10, 2010), *available at* http://sixteen.fibreculturejournal.org/the-assemblage-of-cheating-how-to-study-cheating-as-imbroglio-in-mmorpgs; Stefano de Paoli & Aphra Kerr, *We Will Always Be One Step Ahead of Them*, J. VIRTUAL WORLDS RES. (Feb. 2010), *available at* http://journals.tdl.org/jvwr/article/view/865.

community norms of the game, *or* the legal or cultural norms of the outside world, on the understanding that gamespace is a heterotopic space where such norms are available for reordering. Given that these are usually implied understandings, the enforceability of such norms comes into question time and again. The coexistence of explicit and implicit rules, and the variety of assumptions made about the interactions between these rules and norms are where many certainties come unstuck. Game publishers as service providers have the job of maintaining functional services based on a combination of explicit and implicit rules and norms associated with the game and the nongame context of the game. Given the often cross-jurisdictional and cross-cultural scope of the game service, this can be a particularly difficult task.[42]

Players may have many motivations to cheat: to gain advantage in a game, to win at all costs, to overcome being "stuck." Definitions vary from player to player. One player may consider using a walk-through guide to a game as cheating, and another may consider it a legitimate strategy.[43] Definitions are often contextual rather than universal. Some players expect others to cheat and may, on occasion, cheat themselves, based upon their understanding that everyone else is cheating. Some players break the rules to spoil the game for other players—what Consalvo calls "spoilsport behavior."[44] Kücklich points out that some players cheat as a form of playing—as a meta-game of playing with the game rules.[45] He suggests that cheating can be a way of denaturalizing the coherence of gamespace—of bringing out the underlying coded rule structure of the space.[46] It can be a form of resistance to corporate governance of the space, or lateral peer-to-peer policing. There can be social functions of cheating that establish power relations among players.

Sometimes the definition of cheating varies between the player and the publisher. What the publisher thinks of as exploiting a bug in the code, the player may think of as particularly advanced play, built on an accumulation of knowledge and expertise about the game, unavailable to lesser players, and derived through a complex understanding of the game.

## IV. Griefing

Griefing is a form of play that has overlap with cheating but is not always defined as cheating. Griefing involves players "purposefully engaging in activities

---

42.   *See* Taylor, *supra* note 37.
43.   Consalvo, *supra* note 10, at 409.
44.   *Id.*
45.   Kücklich, *supra* note 1, at 355–67.
46.   *Id.*

*UC IRVINE LAW REVIEW* [Vol. 2:507

to disrupt the gaming experience of the other players."[47] Griefing is seen to be malicious and damaging to the experience of other players, rather than directed at gaining advantage or progressing in the game. It might be characterized as breaking community norms and expectations more than code or explicit rule sets. Foo and Koivisto identify four different categories of motivation in players who are grief players.[48]

Some motivations are game influenced: they are enabled by the anonymity available, by boredom, or by greed. Players may be testing the limits of the game, or perhaps succumbing to game pressure, where the bad behavior is the result of being overwhelmed by the demands of the game.[49]

The second set of motivations Foo and Koivisto[50] identify are player influenced. A player may operate out of spite, to exploit victim vulnerability, or to exact revenge on other players.

The third set of motivations is griefer influenced. The griefer may set about griefing other players in order to become part of a group—a form of ritualization and group identity. This can also be seen as reputation driven—usually within the griefer group, but also if the player is seeking a broader reputation as someone who is "bad."

The final set of motivations appears to be driven by the internal state of the player.[51] The player may be in a bad mood, or acting on a desire for power or attention. The player may take pleasure and enjoyment from grief play or, finally, may construe the behavior as role-play and perfectly within character for his or her current avatar role.

Thus, in games there are numerous ways in which rules are broken through cheating and griefing. The rules may be the explicit rules set up through code or the code of conduct, or the tacit rules of community norms, which are open to challenge, misunderstanding, and negotiation. They may also be the rules of real-world law.

---

47. JESSICA MULLIGAN & BRIDGETTE PATROVSKY, DEVELOPING ONLINE GAMES 250 (2003); *see also* Burcu Bakioglu, *Spectacular Interventions in Second Life: Goon Culture, Griefing and Disruption in Virtual Spaces*, 1 J. VIRTUAL WORLDS RES. 3 (Feb. 2009), *available at* http://journals.tdl.org/jvwr/article/view/348.

48. Chek Yang Foo & Elina M.I. Koivisto, Grief Player Motivations (Dec. 2004) (paper presented at the Other Players Conference, Center for Computer Games Research, IT University of Copenhagen, Denmark, Dec. 6–8, 2004), *available at* http://www.medeley.com/research/grief-player-motivations [hereinafter Foo & Koivisto, Grief Player Motivations]; *see also* Chek Yang Foo & Elina M.I. Koivisto, Defining Grief Play in MMORPGs: Player and Developer Perceptions (2004), in Proceedings of the 2004 ACM SIGCHI International Conference on Advances in Computer Entertainment Technology 245–50, *available* at http://dl.acm.org/citation.cfm?id=1067375 [hereinafter Foo & Koivisto, Defining Grief Play].

49. Foo & Koivisto, Grief Player Motivations, *supra* note 48, at 1–2; Foo & Koivisto, Defining Grief Play, *supra* note 48, at 2–3.

50. Foo & Koivisto, Grief Player Motivations, *supra* note 48.

51. Foo & Koivisto, Defining Grief Play, *supra* note 48, at 3.

V. USER-GENERATED CONTENT, CREATIVITY, AND PUSHING THE BOUNDARIES

In this context, it is important to recognize that players are not passive in their relationship to the game. As well as "playing," and thereby interacting with the game, many are also deliberately creating content for the game.[52] This is particularly so in the context of the creation of "mods": modifications to the game in the form of tools, user-interface enhancements, new character skins, new levels to play, new code, and new artificial intelligence, often shared with other players over the Internet.[53]

Within this culture of creating add-ons and mods, there has inevitably also arisen a culture of tweaking and distorting the dominant game narrative. A mod might have the effect of throwing the balance of the game or giving unfair advantage to some players. It may detract from the original game in the eyes of some. It represents a loss of control of such production and content by the game provider.[54] Publishers take different stances towards mod communities—some encourage them, drawing on the advantages of collective intelligence, while others consider the loss of control too difficult to incorporate into production and service provision, and attempt to close down at least some of the player-generated creative effort.[55] The player productivity represents the shift towards distributed authorship that the onset of the digital network has inspired. It is part of a more generalized "crisis of expertise" where amateurs and enthusiasts produce creative outputs that rival those of their paid counterparts, and a consonant shift in the perceived location of expertise occurs.

---

52.   Greig de Peuter & Nick Dyer-Witheford, *A Playful Multitude? Mobilising and Counter-Mobilising Immaterial Game Labour*, FIBRECULTURE J. (Dec. 1, 2005), http://five.fibreculturejournal .org/fcj-024-a-playful-multitude-mobilising-and-counter-mobilising-immaterial-game-labour   ("Over the last decade or so, authoring tools have been increasingly packaged with computer games, helping to foster a vibrant participatory culture of game modding, or modification. Modders deploy a range of techniques, from changing characters' appearances—skins—and weapons, to designing new scenarios, levels or missions, up to radical departures that amount to building a whole new game—a total conversion—using various authoring tools."); *see also* Olli Sotamaa, *When the Game Is Not Enough*, 5 GAMES & CULTURE 239 (2010) [hereinafter Sotamaa, *When the Game Is Not Enough*]; Olli Sotamaa, Computer Game Modding, Intermediality and Participatory Culture (2004) [hereinafter Sotamaa, Computer Game Modding] (unpublished seminar paper), *available at* http://www.uta.fi/ ~olli.sotamaa/documents/sotamaa_participatory_culture.pdf.

53.   Sotamaa, *When the Game is Not Enough*, *supra* note 52, at 3, 5–7; Sotamaa, Computer Game Modding, *supra* note 52.

54.   Jennifer R. Whitson, *Rule Making and Rule Breaking: Game Development and the Governance of Emergent Behaviour*, FIBRECULTURE J. (July 10, 2010), http://sixteen.fibreculturejournal.org/rule-making-and-rule-breaking-game-development-and-the-governance-of-emergent-behaviour.

55.   *See* YOCHAI BENKLER, THE WEALTH OF NETWORKS (2006) (discussing the efficiencies and advantages of such collective activities); PIERRE LÉVY, COLLECTIVE INTELLIGENCE (Robert Bononno trans., Perseus Books 1997) (illustrating the concept of collective intelligence); *see also* J.C. Herz, *Harnessing the Hive: How Online Games Drive Networked Innovation*, 20 RELEASE 1.0, at 1 (2002).

The inevitable consequence of the rise of user-generated content in the games sphere is, as with music and video mash-ups, a chaotic and profligate use of material that is harvested from other areas of popular culture:

> Modders often import content for an altered game from some other pop culture artefact—either from another game, perhaps owned by a company other than the one that made the original game, or from another media, such as a film. In doing this, these modders are constructing a "commons" of images, characters, and themes, in violation of the corporate enclosures that divide them up into carefully policed proprietary domains.[56]

These mods give rise to intellectual property (IP) issues that are generally strictly monitored and enforced by the IP owners. For example, in 2001 a mod was produced for Quake 3 which featured characters and weapons from Duke Nukem 3D, a title owned by Apogee. Apogee contacted the team that created the successful and well-received mod and threatened them with legal action, stopping development of the mod.[57] Thus, we see the publishers drawing upon real-world law in order to address player activities.

Increasingly these activities have taken on a slightly subversive attitude, prompted at least in part by the strong assertion of IP rights.[58] While most modders are motivated by their love of and desire to extend and improve their gaming experience, some are using the game to critique it or the broader culture. "The wide diffusion of game-making know-how, and the availability of easy to use authoring devices, such as Flash, has led to a spate of alternative games that contribute to the circulation and provocation of struggles associated with feminist, counter-globalisation, and anti-war movements."[59]

As Irene Chien has observed in the case of machinima (movies made within games, using game environments and characters to enact scenarios not necessarily associated with the game theme, and then publishing these movies on the Internet), and in particular machinima made in violent war games, it is its very self-reflexivity that allows its creators "to make such potent critiques of mediated war fantasy."[60] The example discussed by Chien is the well-known Red vs. Blue series which employs the characters and context of the Halo universe to critique both the repetitive and violent nature of the game and the banality and meaninglessness

---

56. De Peuter & Dyer-Witheford, *supra* note 52.

57. *See* Postigo, *supra* note 24, at 62–66 (discussing a similar issue generated by the creation of the GI Joe mod for Battlefield 1942).

58. *See* Dorothy E. Warner & Mike Raiter, *Social Context in Massively-Multiplayer Online Games (MMOGs): Ethical Questions in Shared Space*, 4 INT'L REV. INFO. ETHICS 46 (2005). Griefing may also occur as a response to censorship, for example, the ban in Germany on the display of Nazi symbols and U.S. restrictions on nudity and sex.

59. De Peuter & Dyer-Witheford, *supra* note 52.

60. Irene Chien, *Playing Against the Grain: Machinima and Military Gaming, in* JOYSTICK SOLDIERS 240, 241 (Nina B. Huntemann & Matthew Thomas Payne eds., 2010).

of war, in particular, the Iraq war.[61] The characters in the game cannot die, and therefore they cannot even use death to escape their meaningless existence as cannon fodder for unseen powers.

User creativity and user-generated content can thus represent a loss of control for publishers, but can also engender nonplay activities such as social critique, political protest, and other forms of activity that bring issues of freedom of speech—a right derived from real-world law—into the proprietary spaces of games.

### VI. POLICING AND SANCTIONS—WHOSE JOB IS IT TO ENFORCE RULES?

Within this complex system then, we have a number of different rule sets in play. There are the explicit and often hard-coded game rules. There are legal documents such as end user license agreements, terms of service, and rules of conduct. There is a range of community norms inside the game and outside the game. These may well be at odds with each other, and the heterotopic function of games as spaces of otherness and reordering legitimates (at least in the minds of some players) the differences between internal game community norms and external societal community norms. However, as with most community norms, the rules are tacit, open to interpretation and misunderstanding. There are also rules in the form of the laws of society and government regulations. Sometimes there is a clear case for the consensual suspension of these rules, as when a game like EVE Online makes piracy and theft part of the gameplay.[62] But other laws may be less open to suspension through consent.

Operating within this complex environment of overlapping rules are players who are differently motivated and differently located (making some jurisdictional questions and cultural norms questions even more complicated), and who may break the rules in a range of ways. They may deliberately cheat and break explicit game rules, or they may indulge in griefing that contravenes community norms. They may even engage in productive and creative behaviors that result in mods that break real-world laws. They may engage in acts that contravene game norms, but which they argue are part of a right to free speech and protest.

The task of governance is distributed across a similar number of levels.[63] Players themselves act to police community norms, game providers have customer service or game community managers who attempt in-game governance, lawyers and publishers police a variety of infringements around IP, and the government may act to regulate content. But there is often a blurring of boundaries between

61.   *Id.*
62.   De Zwart, *supra* note 22.
63.   *See* Sal Humphreys, *Ruling the Virtual World: Governance in Massively Multiplayer Online Games,* 11 EUR. J. CULTURAL STUD. 149 (2008).

the jurisdictions of these various bodies, particularly in the face of the emergent activities of players, which are both hard to control and hard to predict.

**Figure 1**: Rules and Norms Pertaining to Online Games



The emergent space created by player interactivity and community exerts pressure both in an inward direction on the game rules, and an outward direction on the legal rules and norms of the world outside the game, even as those same rule systems exert pressure on the players and publishers to behave in particular ways. The EULA is the instrument that is supposed to manage the interface between the systems, but it currently seems inadequate to the task.

VII. CASE STUDIES

We want to look at four different cases of rule breaking and the responses to them as they illustrate a number of different ways that disruptions raise issues about rules and their enforcement.

The first, Twixt, looks at the behavior of a player who followed the rules of the game but not the tacit community rules. The second is the case of the World of Warcraft funeral massacre, in which one guild massacred the players of another guild while they were holding a funeral for a member who had died in real life. This was a case of breaking some external community norms but not game rules. The third case is about the gay, lesbian, bisexual, and transgender (GLBT) World of Warcraft guild that was threatened with account bans for advertising a queer-friendly guild in the general chat channel of the game. In this case, the game management sought to apply a game rule in a rather distorted manner and was

threatened with legal action on the grounds of discrimination. This case looks at the intersection of real-world law, game rules, and community policing. The fourth case examines the work of a performance artist who logged into the America's Army game (a recruitment tool used by the U.S. Army) with the name "dead-in-iraq" and, over a period of some months, typed in the names of all the soldiers killed in the Iraq war. This case raises issues of freedom of speech within gamespaces, but also looks at the question of breaking the community norms of a game by failing to play.

### *A. Case Study One: Twixt*

In the first case study, the behavior of David Myers (an academic games theorist who subscribes to a formalist understanding of games) in the superheroes game City of Heroes (CoH) raises questions of playing against the socially agreed norms of the community while complying with the broader game rules (and possibly narrative).[64] Myers, through his avatar Twixt, attracted the wrath of the player community, inspiring death threats both inside and outside of the game world. Myers rigidly adhered to three sets of behaviors permitted by the game rules but modified by social norms within the game. These behaviors were:

❖ Engaging in aggressive player versus player (PvP) conduct in areas that other players had mutually agreed should be set aside for leveling up.[65] This involved acts of "droning" and "teleporting" foes into nonplayer characters (NPCs);

❖ Refusing to abide by the social agreement not to enter into PvP (heroes versus villains[66]) conduct when the other players were engaged in "farming"[67] or friendly "fight club" competitions. Again, adhering rigidly to the game narrative, Twixt attacked farming villains and interrupted friendly competitions whenever he regarded it as advantageous to do so; and

❖ Refusing invitations to join teams of other players, demonstrating Twixt's unwillingness to team with other players.[68]

In defense of his actions, Myers explained:

According to player custom and according to a long series of discussions

---

64.   *See* David Myers, *What Formalism Is*, POST-KATRINA BLOG (Jan. 18, 2006), http://dmyersloyola.wordpress.com/2006/01/18/what-formalism-is.

65.   "Levelling up" refers to the promotion of a player within the levels of a game based on skill or performance.

66.   Heroes and villains are the two opposing factions within the game on which PvP interactions are based. Twixt was played in the Hero faction.

67.   "Farming" in a gaming context refers to repetitive play to harvest items that are useful in trade with other players.

68.   *See* David Myers, *Play and Punishment: The Sad and Curious Case of Twixt* (July 20, 2009) (research paper), *available at* http://www.scribd.com/doc/91941537/Myers-Play-Punishment-031508 (Myers's own account of Twixt's conduct and the responses it evoked).

*UC IRVINE LAW REVIEW*                    [Vol. 2:507

on the CoH/V public online forums, droning and tp'ing into npcs were forbidden. But, from Twixt's point of view, droning and other sorts of aggressive teleporting were quite useful to delay or otherwise thwart villain intentions, particularly in cases where the villain contingent outnumbered hero players within the zone. Therefore, Twixt used the teleport-foe tactic whenever necessary and available; and this single tactic was considered his most severe breach of social etiquette.[69]

Inevitably, Twixt's behavior annoyed the other players, who began to send public messages denouncing his behavior:

> Ok . . . where did this person come from. I know tp foe'ing into mobs is considered "legal" but this person is really getting out of hand. I can deal with his droning no problem, but now he's resorted to tp'ing into turrets and letting you get killed seriously . . . is there anything you can do about this particular individual. i mean it's pretty bad when his own faction hates him, but this guy has got to go.[70]

Over time, Twixt continued to engage in his solo rule-based play, ignoring the criticisms and pleas from the other players to desist. Twixt celebrated and listed his successes in capturing the RV zone[71] "hundreds of times"[72] over the course of the year, posting the combat log listing those players Twixt had defeated, eliciting even more vitriol from the other players. Finally, he was evicted from his "Champion-based supergroup"[73] after droning (killing) the villain alt (alternate avatar) of one of the super-group members. Myers recounts the following period of time when he started to receive increasingly threatening messages: "threats of computer sabotage, real-life violence, and a variety of less speculative (and more achievable) in-game harassments and abuses."[74]

Myers observed that with social rules "in effect, the CoH game becomes less a game and more a society."[75] His repeated attempts to explain that his conduct was consistent with the rules of the game fell on a completely unreceptive audience. Myers notes that "because of the recalcitrance of Twixt's opponents, it became increasingly difficult to interpret embedded player social rules, orders, and behaviours within RV as anything other than a means of repressing individual play and players such as Twixt."[76] Twixt became the subject of a "kill Twixt" game plan. Myers notes that any players who were tempted to follow Twixt's lead were

---

69. *Id.* at 7.
70. *Id.* at 11.
71. RV, or Recluse's Victory, was the particular PvP zone where Twixt spent most of his game time, introduced into City of Heroes in 2006.
72. *Id.* at 12.
73. Myers, *supra* note 68, at 13.
74. Myers, *supra* note 68, at 14 (Myers notes that this behaviour manifested itself in very similar patterns on all three servers Twixt was playing on).
75. David Myers, *Was Twixt's Behavior Worthy of Wrath?*, POST-KATRINA BLOG (July 8, 2009), http://dmyersloyola.wordpress.com/2009/07/08/was-twixt's-behavior-worthy-of-wrath.
76. Myers, *supra* note 68, at 15.

subjected to the same social pressure and ultimately altered their gameplay or left RV. He observes that this outcome limited both the number of new tactics and new players who could challenge the dominant players in that zone.[77]

Myers concludes that Twixt's worst transgression in terms of the dominant player population was that his tactics "made him *unlikable*."[78] Ultimately, the dominant social group was repressive and acted to prevent individuals exploring idiosyncratic play.

Thus the sociocultural norms of the game in this case trumped the explicit, coded game rules. As community groups do not have access to the same regulating mechanisms as the programmers who use game code or the community managers employed by the game publisher, they deploy sanctions and exclusions familiar to us from the contexts of our everyday lives. People ganged up on Twixt and resorted to threats, public humiliation, and exclusion from formal group structures. While Twixt refused to conceptualize the gamespace as an inherently social space with social norms, other players clearly deployed a more nuanced understanding of the space that incorporated the flexibility and emergent characteristics of the space rather than a letter-of-the-law approach. Thinking through Foucault's heterotopic frame, the space has the characteristics of changing over time, with the changes driven by social forces.

### B. Case Study Two: The World of Warcraft (WoW) Funeral Massacre

In this example we see the convergence of online and offline spaces, events, and issues result in a long debate over who should take responsibility for what some players read as griefing and others read as legitimate gameplay. We use it to illustrate the way in which policing behavior and applying rules is not straightforward in this arena. Although we think there are no real grounds for any application of real law in this situation, we use it as a means of exploring how cultural norms from outside the game were used by some players and ignored by others. Thus, a sense of "moral" transgression arose, with some players arguing that such sensibilities should be suspended in the gamespace and others clearly drawing a line at how many of our ideas of respectful behavior can be suspended within the gamespace.

Briefly, a guild on a PvP server (in which it is legitimate for players to attack each other in certain zones of the game) had one of its long-standing members die in real life. Guild members decided to hold a memorial service for her in World of Warcraft, which was the context from which most of them knew her. Another guild from the opposing faction swarmed into the memorial service and massacred all the players from the mourning guild. They then posted a video of the massacre online on YouTube that included footage of the massacre and

---

77.  *See id.*
78.  *Id.* at 19.

finished with a banner screen with the text "Sorry for your loss" and "Yes we know we are assholes. :-D."[79] Outrage and debate ensued at this behavior, which was defined by some as griefing, and by others as legitimate play that did not break any rules. What was interesting about the bulletin board discussions, both among players and also among academic commentators on Terra Nova, was the complete lack of consensus about the legitimacy and morality of this event.[80]

To distil the main points that emerged, some people asserted that it is the players' responsibility to look after themselves in this context. The mourning guild members should have known better on a PVP server and protected themselves adequately or held the memorial in a safe zone. They also should not have stepped outside the rules of the game—they broke the "role-playing magic circle" and brought real-world issues into the gamespace without the consent of other players. They expected other players to consent to a temporary rule change (i.e., not to kill them while they held their service) without consultation or agreement with those other players. Therefore, the players holding the memorial were at fault rather than the players who killed them.

Others invoked morality as the issue, observing that some players are bullies, and that in-game actions have out-of-game consequences. This stance clearly eschews the idea of the magic circle as a convenient fiction that ignores real-world intrusions that are clearly part of the game. The opinion here was that people should behave better, and should not be given license to behave badly by the publisher. The genuinely grieving players were greatly upset by the experience. There was a role for the publisher here to intervene and punish poor behavior.

While some argued that it was an issue for the publisher/service provider to police, others argued that game mechanics and publisher policing would never provide adequate protection from griefers unless also backed by strong communities and self-regulation enabled by the game. This would entail stronger structural mechanisms to allow players a measure of power to police each other. This was presented as both a design issue and a community-building issue, with the need for strong communities seen as the basis of action to address griefing.

Other people suggested it was a game issue. Games are about stylized conflict—the conflict cannot be taken out of them. In fact, games need conflict and grant permission to players to behave in ways different from the ordinary world. Thus, games are experimental sites for trying out things that are unacceptable in the ordinary world, and the behavior of the attacking guild was fine and did not necessarily reflect the moral and ethical framework of the participants, nor how they would behave in ordinary world contexts.

---

79. *Serenity Now Crashes a WoW Funeral,* YOUTUBE, http://www.youtube.com/watch?v= l28HbENng7Q&feature=fvst (last visited June 11, 2012).
80. *See* Nate Combs, *The Price of Serenity,* TERRA NOVA BLOG (Apr. 15, 2006), http://terra nova.blogs.com/terra_nova/2006/04/serene.html?cid=6a00d8341c022953ef00d83483ee4953ef #comment-6a00d8341c022953ef00d83483ee4953ef.

Other people raised the possibility of in-game behavior transgressing real-world law, although it is not clear how this particular incident would have done so. Perhaps the most pertinent issue within this block of opinion is that of consent, and whether players actually do give informed consent to the rules of the game or whether there are too many tacit rules for this to ever be possible.

Some suggested that it is the publisher's responsibility as service providers who make money out of encouraging people into mediated social connections to attend to the functioning of those social connections rather than falling back on the "it's just a game" excuse for nonintervention. Publishers need to incentivize good behavior and punish unwanted behavior more strongly.

Finally, and importantly, the diversity among players in terms of their level of investment in the game was raised as one of the key elements that led to such a lack of consonance between player understandings of what was acceptable behavior. Players invest differently in the game—it means many things to many people. Some play more by the "it's just a game" motto and some play with a deep emotional investment and a sense of "fair play" not shared by everyone.

The variety of opinions on this issue is instructive and shows that issues of scale may have brought games to a new point of definition. In a game where the player numbers are relatively small—on a sports field, for instance—it is possible for a shared understanding to be reached, not only of the explicit rules but also of the tacit rules and norms that determine attitudes and behaviors that fall outside of the written code (although even on the sports field such consensus is not guaranteed). In a game where there are millions of players, such consensus will never be reached. Not only will there be variations in understanding from within geographically co-located players, there will also be cross-cultural differences with players from all over the globe entering the game with naturalized expectations about particular behaviors that are simply not understood by players from different cultures.

### C. Case Study Three: The GLBT Guild Recruitment Ad in WoW

In early 2006 a player in World of Warcraft posted a message in the general chat channel of her server seeking to recruit new members for her guild. This is not an unusual practice, and is seen by many as a legitimate way to increase guild numbers. This player, Sara Andrews, advertised that her guild was gay, lesbian, bisexual, and transexual/transgender (GLBT) friendly—meaning it was not exclusively a guild for GLBT people, but that it was friendly toward GLBT people and that some of their members identified as GLBT. In a game where one of the most frequent terms of abuse is to call someone gay or a faggot, the relief of finding such a group for a GLBT person can be important. However, the customer service manager on duty at the time sent a warning to Sara Andrews, telling her it was against the harassment policy of the game to use explicit language

around sexuality in the game. According to Daniel Terdiman in an article on CNet News, the customer service person warned that

> her recruiting was a violation of the game's harassment policy, specifically the section of that policy regarding sexual orientation . . . . The harassment policy specifically prohibits language that "insultingly refers to any aspect of sexual orientation pertaining to themselves or others." Since Andrews was hardly insulting herself, she couldn't understand how or why the harassment policy was being applied to her.[81]

She was warned that if she did not stop she risked being banned from the game. The customer service team further justified its move by suggesting that having an openly GLBT guild would invite harassment of its members and therefore it contravened policy. Blizzard, the publisher that runs the game, initially released a statement saying, in part:

> We encourage community building among our players with others of similar interests, and we understand that guilds are one of the primary ways to forge these communities. . . . However, topics related to sensitive real-world subjects—such as religious, sexual or political preference, for example—have had a tendency to result in communication between players that often breaks down into harassment.[82]

Andrews made the issue public and there was extended commentary on websites, forum boards, and news sites.[83] Lambda Legal, a prominent legal organization that works on GLBT civil rights, sent a letter to Blizzard pointing out some areas where litigation was possible on the basis of current antidiscrimination laws. Having outlined the situation and noted the public explanations offered by Blizzard for its policy and response, Lambda Legal's letter went on to say:

> We are very concerned that Blizzard's policy, as expressed in the foregoing statement, discriminates against LGBT gamers. Although preventing harassment is an admirable goal, a requirement that LGBT people remain invisible and silent is not an acceptable means of reaching that goal. . . .
>
>     . . . .

---

81.    Daniel Terdiman, *Online Game Warns Gay-lesbian Guild*, CNET NEWS (Jan. 31, 2006, 4:15 AM), http://news.cnet.com/Online-game-warns-gay-lesbian-guild/2100-1043_3-6033112.html?tag=mncol;txt.

82.    *Id.*

83.    *See, e.g.,* Neva Chonin, *MMORPG! WOW! TOS! GLBT! Sexual Harassment!*, SFGATE (Feb. 5, 2006), http://articles.sfgate.com/2006-02-05/entertainment/17281709_1_sexual-orientation-harassment-blizzard-entertainment; Brian Crecente, *WoW: Blizzard Gets Gay Rights Warning*, KOTAKU (Feb. 6, 2006, 6:12 PM), http://kotaku.com/153075/wow-blizzard-gets-gay-rights-warning; Vicious Sid, *Blizzard Retraction: Gay Guilds, Players Welcome in World of Warcraft*, GAME PRO (Mar. 9, 2006), http://www.gamepro.com/article/news/52575/blizzard-retraction-gay-guilds-players-welcome-in-world-of-warcraft; Terdiman, *supra* note 81; Mark Ward, *Gay Rights Win in Warcraft World*, BBC NEWS (Feb. 13, 2006, 8:42 AM), http://news.bbc.co.uk/2/hi/technology/4700754.stm.

Although Blizzard is well within its rights to insist that players avoid referring to other gamers in an "insulting manner," Blizzard cannot issue a blanket ban on any mention of sexual orientation or gender identity. There is nothing "insulting" about identifying oneself as gay, lesbian or transgender, nor does the announcement of a guild for LGBT gamers constitute "harassment" in any sense of the word. If other players react insultingly to the mere presence of LGBT gamers, then Blizzard should discipline the harassers, not attempt preemptively to silence the potential victims of harassment.[84]

They went on to describe the legal issues as they see them:

Online environments are public accommodations, subject to regulation as such. Discrimination against LGBT individuals in the provision of public accommodations is clearly prohibited by California law. It has been so for more than fifty years. Insisting that LGBT persons not discuss their sexual orientation or gender identity can constitute discrimination under California law.[85]

Essentially, Lambda Legal was arguing that antidiscrimination laws enacted to deal with public places should apply to the contractually controlled virtual environment of World of Warcraft, which, it may be remembered, has a population of over eleven million. However, the argument that online worlds are places of public accommodations in which content could be regulated under federal and state antidiscrimination laws was dismissed in the recent case filed in the U.S. District Court for the Central District of California, *Stern v. Sony Corporation*,[86] which concerned a claim by a plaintiff with visual and learning difficulties that Sony should be required to enable modifications to facilitate visual and auditory cues so that the plaintiff could play games such as Everquest. The judge dismissed the claim on the basis that the relevant provisions of the Americans with Disabilities Act,[87] applied only to physical places, or goods or services connected to physical places. Thus, the argument that online environments are places of public accommodation, advanced by Lambda Legal, is unlikely to succeed due to a rejection of a similar argument in *Stern*.[88]

Eventually Blizzard reversed its decision and offered an apology to Sara Andrews. It said the initial decision was a mistake and that it was going to ensure that the thousand or so customer service representatives working in the game

---

84.   Crecente, *supra* note 83.

85.   *Id.* (citations omitted).

86.   Stern v. Sony Corp., No. CV09-7710PA, 2010 WL 326224 (C.D. Cal. Oct. 23, 2009); *see also infra* note 103 and accompanying text.

87.   42 U.S.C. §§ 12101–12213 (2006 & Supp. III 2009).

88.   It is acknowledged that the status of the GLBT guild relates to discrimination rather than disability, however, it is the characterization of the "place of public accommodation" that is the key legal concept being considered here. It is also noted that the decision in *Stern* would be merely persuasive, rather than binding upon the court hearing the GLBT Blizzard case.

would undergo sensitivity training in order to avoid a repetition. They also indicated they would be looking at their policy on harassment.

This case illustrates again the interweaving of the different levels of rules and norms and the issues that arise around enforcement. The explicit rules of conduct for the game seem to be designed to prevent harassment and discrimination within the game. In practice the rules manifestly fail to do this as repeated harassment of GLBT folk is common within the game. Thus, enforcement of this rule is not reflected in the practices of the customer service people operating within the game, and cultural norms are at variance with the game rules. However, when the rules were then used to justify the silencing of GLBT people, those people sought remedy from the set of outside legal rules that guarantees civil rights (in some jurisdictions). For Blizzard, it is difficult to say what motivated them more—the public controversy that erupted, which threatened their reputation and thus their bottom line, or the threat of legal and very public action against them. In this case the rules of the game were not in contradiction to the legal rules of the ordinary world, but the enforcement and the practices within the private corporate space went against that rule set. Given that accountability within private policing regimes is almost nonexistent,[89] a remedy had to be sought in a more accountable sphere.

The outcome for Sara Andrews and other GLBT people playing the game in this case was positive, but the process of taking Blizzard to task on this required a certain robustness, as well as a capacity to mobilize larger networks of support. It should be kept in mind that many players, dealt with unfairly by private governance systems, do not have access to such resources and mostly, one must assume, take no action in the face of discriminatory behavior by corporations.

Like the previous case, this one deals with kinds of behavior that can be considered legitimate within gamespaces but that may be illegitimate in nongame spaces. Perhaps this is also an illustration of where cultural norms do not align with formal rules—either inside the game or outside. Homophobic taunting and hate speech are still relatively common in many people's everyday lives. This cultural norm persists despite being against the law in many jurisdictions. These same cultural norms are brought by some players into the game, where again they contravene game rules, and again there is a misalignment of culture and rules, and the discretionary power of regulators to enforce such rules becomes a factor.

### D. Case Study Four: dead-in-iraq

America's Army is an online game released by the U.S. Army in 2002 for free download. It has, like most online games, evolved through a series of versions, with America's Army 3 being released in 2009. It is now encompassed as a core

---

89.    Elizabeth E. Joh, *The Paradox of Private Policing*, 95 J. CRIM. L. & CRIMINOLOGY 49 (2004).

aspect of the larger Army Game Project.[90] The purpose of the game is "to educate the American public about the US Army and its career opportunities, high tech environment, values, and team-work."[91] The game has proven to be extremely popular outside of its purpose as a recruiting tool, with nine million registered users by early 2008.[92] It is also available in versions for Xbox, Xbox LIVE, arcade, and mobile devices. The America's Army game is supported by a range of additional content, including the website, which provides regular updates on the lives of the "Real Heroes."[93]

Even within this tightly maintained and heavily supported environment, with a clear message proposed by its publisher, there is room for divergence. As Allen observes, "[G]roups of players continually reinscribe the game with new meanings that are divergent from the official Army message."[94] Of particular interest in the context of this study is the work of Joseph DeLappe.

In March 2006 DeLappe logged into America's Army using the name dead-in-iraq, and commenced manually typing the name, age, service branch, and date of death of each U.S. service person who had died in the Iraq conflict into the game's text messaging system. He describes the work as "a fleeting, online memorial to those military personnel who have been killed in this ongoing conflict. My actions are also intended as a cautionary gesture."[95] He does not engage in any of the gameplay, rather he continues to type in names until, inevitably, he is killed: "After death, I hover over my dead avatar's body and continue to type. Upon being re-incarnated in the next round, I continue the cycle."[96] This conduct frequently evokes abuse from the other players who generally do not understand what he is doing. This confusion is forgivable because DeLappe does not stop typing to explain his actions, and the players are left to work it out for themselves or from accounts they have picked up in the media. DeLappe observed that the other players are "generally hostile"; however, on occasion players have defended his actions and even once stood in front of him to

---

90.   This includes the Virtual Army Experience ("VAE"), which travels around the U.S. to events such as air shows and state fairs. This interactive gaming experience (or simulation) takes place inside a carnival tent, and enables small groups of players (over the age of thirteen) to participate in a short segment of the game while seated in life-size props, such as Black Hawk helicopters and Humvees. In these props the participants shoot at the enemy on the screen and experiencing shaking of the vehicle. For a discussion of the VAE and its ancillary activities, see Robertson Allen, *The Army Rolls Through Indianapolis: Fieldwork at the Virtual Army Experience*, 2 TRANSFORMATIVE WORKS & CULTURES (2009), *available at* http://dx.doi.org/10.3983/twc.2009.0080.

91.   Robertson Allen, *The Unreal Enemy of America's Army*, 6 GAMES & CULTURE 38 (2011) (citing U.S. ARMY, AMERICA'S ARMY: OPERATIONS 1 (1999), *available at* http://www.gamefront .com/files/service/thankyou?id=669011).

92.   *Id.* at 43.

93.   *Id.*

94.   Allen, *supra* note 91.

95.   Joseph DeLappe, *Dead-in-Iraq, 2006-Ongoing*, U. NEV. RENO, http://www.unr.edu/art/ delappe/gaming/dead_in_iraq/dead_in_iraq%20jpegs.html (last visited June 11, 2012).

96.   *Id.*

take the bullets.[97] In part, it is his refusal to play that is provocative in a supposedly dedicated play space. His political critique repurposes the space for cultural and political purposes that resonate outside of the game. But America's Army could likewise be characterized as existing for the real-world purpose of recruiting people to the army. In this way we see the concept of the magic circle broken down, and the space more readily identified as a heterotopia that operates in conjunction with other spaces. DeLappe, when directly questioned about breaking the illusion of the magic circle, responded: "I see these works as a way to break through and perhaps expand the notion of 'the magic circle' in gaming. We do not 'play' in contexts that are unrelated to our political, social and economic realities."[98]

Chan observes:

> By claiming such a lineage of radical cultural practice for dead-in-iraq and by bringing a type of online performance art to the virtual streets this time, DeLappe is in essence advocating a social refunctioning of art in general and digital game art in particular. His work draws attention to how online spaces have effectively become normalised. Such virtual turf is now considered part of everyday space.[99]

It is this last comment which is most contested. In exactly whose space is DeLappe protesting when he is engaging in his act of memorial, and does it matter? Are online games public spaces? And in particular, is an online space run by a public institution such as the U.S. Army a public space? As discussed above, with respect to the GLBT guild example, should there be a right to freedom of speech in such spaces? Chan notes that "De Lappe's project directs attention to questions about the ownership of Internet space."[100] In particular, Chan notes the complaints of the players of the game and questions what implications this has for the consideration of who owns the ludic space of the game.

DeLappe himself characterizes the online spaces he engages with as "public spaces." In a 2010 interview he stated, "I first engaged in performing in game spaces upon the realization that these online environments could be considered a new type of public space. I definitely consider my work to have a direct lineage to street theatre/interventions, etc."[101]

---

97.   Mathias Jansson, *Interview: Joseph DeLappe, Pioneer of Online Game Performance Art*, GAMESCENES (May 20, 2010, 10:31 PM), http://www.gamescenes.org/2010/05/interview-with-joseph-delappe-a-pioneer-of-on-line-performancewhen-did-you-start-to-use-on-line-gaming-for-your-performances.html.

98.   *Id.*

99.   Dean Chan, *Dead-in-Iraq: The Spatial Politics of Digital Game Art Activism and the In-Game Protest, in* JOYSTICK SOLDIERS: THE POLITICS OF PLAY IN MILITARY VIDEO GAMES 272, 278 (Nina B. Huntemann & Matthew Thomas Payne eds., 2010).

100.   *Id.* at 280; *see also* Ren Reynolds, *Dead-in-Iraq,* TERRA NOVA (May 5, 2006), http://terranova.blogs.com/terra_nova/2006/05/deadiniraq_.html.

101.   Jansson, *supra* note 97.

While Chan characterizes this question as being about "Internet space," there is a vast difference between gamespace and Internet space in general. In particular, it is arguable that the space in a game environment is owned by the game provider. The provider has not only created and maintained that environment, but it is hosted on servers that it owns or leases. While a user may pay a subscription fee, there are an increasing number of free-to-play online games, such as America's Army. Increasingly people are congregating in places that are owned by corporations rather than town halls or squares.

MMOGs are social spaces. For some, gaming is as much about socializing as it is about attaining the game object. Thus, as previously mentioned, not all in-game activity is playing. Is this realization enough to turn them into public spaces? Recent U.S. case law would suggest not. In 2009 Erik Estavillo, a keen gamer, was banned from the Sony PlayStation 3 Network (PSN) on the basis of violation of the PSN terms of service. In particular, Sony claimed that Estavillo had engaged in repeated abusive verbal conduct while playing the game Resistance: Fall of Man. Sony's ban meant that Estavillo could no longer access any of the games or services provided by the PSN. This impacted his ability to socialize (given that he was confined by his numerous disabilities and ailments to his home), and it also prevented him from accessing the money in his Play Station Network Wallet Fund. Estavillo brought an action against Sony alleging that the ban violated his free speech rights under the First Amendment, as well as secondary liability claims relating to breach of contract, claiming 55,000 dollars in damages. Estavillo's claim provided an opportunity for a U.S. court to consider directly the issue of whether the First Amendment would operate to protect freedom of speech in a virtual world context. Several U.S. academics had argued that online spaces, such as virtual worlds and MMOGs, could be analogized to a "company town," thus satisfying the exception to the principle that the First Amendment operates to guarantee freedom of speech only against abridgement of that right by state or federal governments, rather than private actors.[102] This exception operates where the private corporation acts as the government, providing services and regulation in a corporate town.

In his short judgment in *Estavillo v. Sony Computer Entertainment America*, Judge Whyte dismissed Estavillo's claim on the basis that it failed to allege facts sufficient to state a First Amendment claim against Sony.[103] He stated:

> Sony's network is not similar to a company town. The Network does not serve a substantial portion of a municipality's functions, but rather

---

102.   Jack M. Balkin, *Virtual Liberty: Freedom to Design and Freedom to Play in Virtual Worlds*, 90 VA. L. REV. 2043 (2004); Peter S. Jenkins, *The Virtual World as a Company Town: Freedom of Speech in Massively Multiple Online Role Playing Games*, 8 J. INTERNET L. 1 (2004); Jason S. Zack, *The Ultimate Company Town: Wading in the Digital Marsh of Second Life*, 10 U. PA. J. CONST. L. 225 (2007).

103.   Estavillo v. Sony Computer Entm't Am., No. C-09-03007 (RMW), 2009 WL 3072887 (N.D. Cal. Sept. 22, 2009).

serves solely as a forum for people to interact subject to specific contractual terms. Every regulation Sony applies in the Network is confined in scope only to those entertainment services that Sony provides. Although the Network does include "virtual spaces" such as virtual "homes" and a virtual "mall" that are used by a substantial number of users ... these "spaces" serve solely to enrich the entertainment services on Sony's private network.[104]

Rather than acting as a municipal government (as some commentators have characterized virtual world providers), "Sony is merely providing a robust commercial product," according to Judge Whyte's opinion.[105] Neither did Sony have any structural or functional nexus to a state or federal government. Therefore, there was no basis to sustain a claim on the First Amendment. For this reason, the claims under state law were also dismissed. It is possible that a stronger case could be made with respect to a social virtual world. Given this role of the game provider, how much responsibility should it bear for promoting ethical or responsible play within that environment?[106]

Asked about the opportunities presented by online and game performances, DeLappe stated:

> [I]t is a subversive stance to say that online environments represent a new type of public space. I am an artist very concerned with reaching an audience—with affecting change—one cannot do so working in a vacuum (whether that vacuum is the private artists [sic] studio or the art world). Very important to me that the work get out there in a way that both represents taking agency and presenting creative experiences that interrupt or intervene within these online contexts.[107]

DeLappe's conduct is not in direct breach of the EULA. However, under the terms of the Code of Conduct, players may be voted out of a session of the game as a consequence of engaging in a range of behavior that is deemed to be unacceptable, such as harassment, foul language, and refusal to follow orders. DeLappe has been vote-kicked out of the game on occasion for "chat spam."[108]

Gregson suggests that politically motivated griefing is unlikely to be successful because rather than inspiring and converting the other players, it merely causes them frustration, shutting them off from the overall message.[109] This does seem to be borne out by DeLappe's experiences.

However, as Joshua Fairfield has commented with respect to dead-in-iraq:

The willingness to speak in contravention of the law is the single greatest

---

104.    *Id.* at *2.
105.    *Id.*
106.    Warner & Raiter, *supra* note 58.
107.    Jansson, *supra* note 97.
108.    Chan, *supra* note 99, at 281–82.
109.    Kimberly Gregson, *Bad Avatar! Griefing in Virtual Worlds*, 10 M/C: J. MEDIA & CULTURE 1 (Oct. 2007), *available at* http://journal.media-culture.org.au/0710/06-gregson.php.

purveyor of political content. When nuns protest weapons by trespassing, or dead-in-iraq reads out the war dead online, let's be clear: they're breaking the law of trespass, or the licence agreement they signed when they logged in. But that doesn't change the analysis a single whit.

Sometimes breaking the rules *is* the message.[110]

Perhaps DeLappe's actions can best be understood in the context of Foucault's heterotopias. For DeLappe, the game platform of America's Army is a space from which he can comment upon America's involvement in Iraq. It is an environment which is (relatively) safe and one to which he can relate as an artist, promoting nonviolent protest. Yet the analogy and message are clear. Thus the role of online spaces as art and protest spaces, contingent to, and looking upon (yet separate from) all aspects of the everyday, is emerging.

## CONCLUSIONS

Each of these cases demonstrates a different set of norms or rules in play. With Twixt we see the rule-abiding player being ejected by other players for transgressing in-game social norms that have emerged from gameplay and interaction among players. In the WoW massacre we see players being condemned for transgressing out-of-game cultural or social norms, even though they were within the bounds of the game rules and those who were transgressing the in-game rules were the ones seen to be the injured parties. In the WoW GLBT case we see the game rule enforcers—the publishers—being called to account for their rule implementation. And when in-game strategies of redress failed, the shadow of an out-of-game legal system was brought to bear. In the final case, DeLappe's transgressions directly tie the out-of-game issues of war to the in-game context, provoking mixed responses from players, and testing the boundaries of freedom of speech as it extends into proprietary space.

The point of this exploration has been to map out some of the overlapping laws and social and cultural norms in a way that illustrates the dynamic complexity of negotiations around rules, laws, and sociocultural norms that arise in specific contexts such as MMOGs. Using a Foucauldian framework of heterotopias allows us to characterize gamespace as more complex than that space envisaged by the magic circle. Heterotopic space can accommodate the dynamic and complex range of meanings and processes that take place—there are no jarring contradictions when it becomes apparent that the limits of different normative and legal orders are constantly in flux. No hardbound magic circle attempts to contain activities within a single sphere, but rather the permeabilities of the boundaries of gamespace can be acknowledged and worked with. The framework of heterotopias seems to provide a better model with its understanding of these

---

110. Joshua Fairfield, Comment to *Dead-in-Iraq*, TERRA NOVA (May 8, 2006, 1:57 PM), http://terranova.blogs.com/terra_nova/2006/05/deadiniraq_.html (scroll to comment 25).

*UC IRVINE LAW REVIEW* [Vol. 2:507

spaces as "something like counter-sites . . . all the other real sites that can be found within the culture, are simultaneously represented, contested, and inverted."[111]

This kind of analysis provides an empirically descriptive theory about rules, jurisdictions, and norms. It doesn't tell us what the role of law, game publishers, community managers, or players *should* be, but it does tell us something of what the limits of rules sets may be as the competition between them is negotiated at multiple levels. Implicit in the magic circle conception of games is an understanding of power as being wielded through a top-down structure. The arguments so far have been about whether the game's publisher or the real-world law should be in control of games. The exploration in this Paper and the framework of heterotopias suggests instead that not only do many different stakeholders wield the power, but that they wield it at many levels. Rather than top-down, it can be seen as bottom-up, distributed, occurring in the minutiae of behaviors. Foucault suggests that we can understand the operations of power by examining this granularity at the quotidian level. We can see how the various strategies deployed by different stakeholders or actors within this sphere generate a range of behaviors and outcomes, only some of which can be attributed to the law.

The law can be seen to be only one arm of the operations of power at work here, and the End User License Agreement in particular holds only limited power to determine the terms under which people conduct themselves within online games spaces. The case studies show that people's expectations are culturally as well as jurisdictionally derived. This has implications for the manner in which courts might approach cases brought before them. In particular, as Fairfield and others have suggested, it requires a greater willingness to approach MMOGs as meaningful spaces, rather than merely to dismiss them as games or spaces governed solely by one-sided contracts.[112] Online games are clearly more than contractual spaces; they facilitate engagement, creativity, friendship, and protest. They form part of the everyday experiences of millions of users and therefore provide an important domain for human interaction. Foucault's heterotopic view may provide a useful framework for further meaningful and constructive work towards effective and fair lawmaking in this area.

---

111. Foucault, *supra* note 15, at 24.
112. Fairfield, *Anti-Social Contracts*, *supra* note 8; Edward Castronova, *Lights Going Out in the Anti-RMT Bunker*, TERRA NOVA (Feb. 16, 2010), http://terranova.blogs.com/terra_nova/2010/02/lights-going-out-in-the-antirmt-bunker.html.

WATCH LIVE: 9/11 Remembrance Ceremonies



Home   News   Weather   Investigative Unit   Sports                    LIVE TV    ☀ 64   Connect

Local   State   U.S. & World   Elections   #Trending   Entertainment   Bay Area Revelations   Bay Area Proud   California Live   In The Weeds   Tech   Health   Weird

PUBLIC RECORDS SEARCH                                          TruthFinder

First Name          Last Name          State            ⌄          SEARCH NOW

# Gamer Sues Sony Over First Amendment

After being banned from a game for "trash talking", Erik Estavillo wants $55,000 and says he needs the game to socialize

By Laura Riparbelli

Published Jul 22, 2009 at 8:05 AM | Updated at 11:07 AM PDT on Jul 24, 2009



Erik Estavillo of San Jose wants $55,000 from Sony for taking away his only source of communication.

What happens when you take away someone's video games? You might get sued.

A San Jose, Calif., man is suing Sony, claiming the company violated his first amendment rights when they banned him from playing the PlayStation 3 game "Resistance"for something he may have said while communicating with other players.

Erik Estavillo, who says he suffers from agoraphobia, a fear of crowds and public places, depends completely on the PlayStation game for social interaction. But Sony occasionally bans users from the on line gaming system when they engage in inappropriate behavior. Estavillo admits that he was doing some "trash talking" while playing "Resistance," but says that virtually everyone who plays the game participates in the same language and he is unsure as to why he was singled out.

Estavillo was issued three warnings before having his account permanently locked. He says he can't remember exactly what he said to set off the Sony banners the final time, although he encourages those interested to visit his YouTube page where he discusses his ailments with Sony in detail.

"I can't really go outside," said Estavillo. "On the game, I met a lot of people I liked, and a lot of people that liked me. When they cut me off, I couldn't talk to those

## TRENDING STORIES

 VIDEO Judge in Brock Turner Case Hired as High School Tennis Coach

 VIDEO Campbell Planning Commission Deadlocks on In-N-Out

 VIDEO Deaf Woman Refused Service, Mocked at Calif. Fast Food Drive-Thru

 2 Lucky Scratchers Players Claim Millions in Bay Area

## WEATHER FORECAST

San Jose, CA Change ⌄

⛅ 64° Few Clouds
Feels Like 64

PRESENTED BY
Mancini's SLEEPWORLD



 Radar     Forecast

## WHAT DO YOU THINK?

friends anymore." One of those friends is gamer BarbieGirl, who Estavillo says he views as a sister.

Estavillo, 29, cited a number of mental disorders in his filed complaint against Sony on July 6, which claimed the ban "has caused pain and suffering to an already disabled plaintiff."

"[Because of my health], I need all the support I can get. This game is how I communicate with people," he said.

He is suing on four counts of unlawful behavior, one being the violation of his first amendment rights and another on counts of theft. Estavillo claims he has money in the videogame's store, which is inaccessible to banned users.

Estavillo is demanding $55,000 in punitive damages as well as "pain and suffering damages."

Sony has yet to respond to the suit.

**MORE FROM THE WEB**

**People Who Retire Comfortably Avoid These Financial Advisor Mistakes**
SmartAsset
Sponsored

**50 Abandoned Aircraft That Haven't Been Touch...**
Yeah! Motor
Sponsored

**Small Internet Stock Receives Rare "Ultimate...**
The Motley Fool
Sponsored

**14 Amazing Inventions You Won't Believe Exist**
Definition
Sponsored

**WHAT DO YOU THINK?**

**Do you feel fulfilled in life right now?**

○ I'm content but not fulfilled

○ No, not at all

○ Yes, completely

○ Not sure

Powered by CivicScience | Privacy Policy



The $1 MILLION home-sharing DISASTER.
WATCH NOW
LOCAL RESPONDS

**NEWSLETTERS**

Receive the latest local updates in your inbox
**Email**
Email                Sign up

Privacy policy | More Newsletters

ⓘ ✕

**Police Say To Carry This**
Police say everyone should carry this new safety device that protects against attackers.
TrySaferHomeAlarms.com